## COMMONWEALTH *vs.* THOMAS J. BALLOU, JR.

Suffolk. May 2, 1966. — June 3, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Search and Seizure. Arrest. Police. Practice, Criminal,* Double jeopardy.

Dismissal of a complaint in a District Court after allowance of a motion to suppress, without the defendant's being placed on trial, did not put him in jeopardy nor bar on the ground of double jeopardy a subsequent indictment and trial of him in the Superior Court for the same offence. [752]

In the circumstances, where it appeared in the case of a defendant indicted for unlawfully carrying a revolver that a police captain knew of the defendant's reputation as a gangster and as a "bad one" who was prone to carry a gun and had been previously convicted of doing so and who had been involved in gang warfare, that as the result of an anonymous tip that the defendant and other men were carrying firearms the captain, accompanied by a police detective, went forth to find the men, and that upon finding the defendant on a street the captain "frisked" him without his consent and found a loaded revolver concealed on his person, it was held that the captain, for his own and the detective's protection and the safety of the public, was entitled to "frisk" the defendant to ascertain whether he was armed, and that motions by the defendant to suppress evidence of the discovered revolver and to dismiss the indictment on the ground that the revolver had been found in an unreasonable and illegal search were properly denied. [755–757]

Testimony by a police officer that he considered the defendant in a criminal case to be under arrest at a certain time was merely an opinion on a matter of law which was not conclusive. [756]

Where a police officer properly "frisked" one and found a loaded revolver concealed on his person there was probable cause for his arrest. [756]

INDICTMENT found and returned in the Superior Court on November 2, 1965.

Certain questions were reported by *Tauro,* C.J.

*F. Lee Bailey* for the defendant.

*John F. McAuliffe,* Assistant District Attorney (*James F. Sullivan,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

WILKINS, C.J.   The defendant was convicted by a judge sitting without jury on an indictment charging him with unlawfully carrying "on his person a certain firearm, to wit: a revolver . . . ." G. L. c. 269, § 10, as amended. The judge stayed proceedings and has reported three questions of law to this court. G. L. (Ter. Ed.) c. 278, § 30.

The first question is, "did the allowance of the defendant's motion to suppress in the Charlestown District Court followed by a dismissal of the complaint by the same court constitute a bar to a subsequent indictment and trial of the defendant in the Superior Court for the same offense?"

The defendant was brought before the District Court on September 15, 1965, the day after his arrest. He pleaded not guilty. After several continuances there was a hearing on his motion to suppress. The defendant was not placed on trial. The only witness was Captain Bulens, the arresting officer, who was called by the defendant. The motion was granted and the complaint dismissed. The report states that the defendant was not placed in jeopardy, and cites *Commonwealth* v. *Micheli,* 258 Mass. 89, 91, where it was said, "Dismissing a complaint without a trial on the merits is no bar to a trial for the same offence charged in the complaint dismissed." The ruling of the judge was right. There was no jeopardy. *Commonwealth* v. *Bressant,* 126 Mass. 246, 247. *Commonwealth* v. *Anderson,* 220 Mass. 142, 143–144.   22 C. J. S., Criminal Law, § 254.

The other questions reported are: "2. Was the Court warranted in denying defendant's motion to suppress evidence and motion to dismiss? 3. Was the Court warranted in finding the defendant guilty?"

The facts are from the judge's report.

Detective McLean testified.   On September 14, 1965, about 12:45 P.M. he was at Boston police headquarters, where he received a telephone call from an unidentified informant, who asked for Detective-Sergeant Lynch, formerly assigned to the Charlestown area. Detective McLean said that Lynch was out, but that he was Lynch's partner, and would take the message for him.   The informant asked for

and was told Detective McLean's name. After hesitating he told the detective that "Buddy" McLean, Ballou, and one Winters or Winston were in Driscoll's Café on Medford Street, Charlestown, and that they all had guns. Detective McLean asked the informant for his name, but the latter refused. The detective immediately telephoned Sergeant Sweeney of police headquarters, and repeated the tip in every detail. Detective McLean did not know the defendant personally, but did know of him through circulars bearing his picture which were posted on the police bulletin board and which identified him as "involved in the controversy between the McLean and McLaughlin factions." The police frequently received and acted upon this type of anonymous tip. This is considered good police practice.

The testimony of Sergeant Sweeney is somewhat at variance with that of Detective McLean according to the judge. His findings are that in the telephone call from the detective Sweeney was told only that the detective had "good information that Tommy Ballou, Buddy McLean" and a third person whose name Sweeney did not know "were in a joint, in Charlestown, and [that] they all had pieces — were armed." Sweeney was unaware that the detective's information was the product of a tip. He also believed the "joint" was on Main Street rather than on Medford Street. Sergeant Sweeney knew the defendant at the time of the call. He knew that Ballou had been convicted on a gun carrying charge and had spent time in prison for this offence; that his parole had been revoked and he had been returned to prison but later released; and that he was known to carry a gun. He also knew that Ballou was a friend of "Buddy" McLean, and that prior to his association with McLean he had been a friend of some associates of the McLaughlins. After Sergeant Sweeney finished talking with Detective McLean, he said in a telephone call to Captain Bulens of Division 15 in Charlestown that he had "good information that Buddy McLean, Ballou, and a third man [he] didn't know . . . were in a joint in Charlestown," which he believed to be on Main Street; and that they were armed.

Captain Bulens had known Sergeant Sweeney for some years. He knew that it was the latter's job to "tail" known criminal elements. In the call from Sergeant Sweeney he was told that the latter had "good information that Tommy Ballou and Buddy McLean were in some joint in Charlestown on Main Street, and they were carrying guns." He was not told specifically where they were, and was not aware of the source of Sweeney's information.

Acting on the information he received, Captain Bulens and Detective Ingemi drove to Main Street. After checking four drinking establishments, Captain Bulens directed Detective Ingemi to take him to Driscoll's on Medford Street. As they approached Driscoll's, Detective Ingemi saw the defendant, who was unknown to Captain Bulens except by reputation, standing in front of the building. The car stopped, and Captain Bulens unsnapped the top of his holster to free his gun. The two officers got out and approached the defendant. The captain considered Ballou to be under arrest at this point, before he came within five feet of him, though he had not informed him that he was in custody or restrained him physically. Captain Bulens stood by Ballou while Ingemi went over to McLean in a doorway and searched him with his permission. McLean was found to be unarmed. Detective Ingemi rejoined Ballou and Captain Bulens. The captain "patted down" Ballou without his permission and "felt an object stuck inside of his belt" underneath his sweater. The captain reached in and removed a loaded .38 calibre revolver. The revolver showed no bulge and was not plainly visible unless the sweater was lifted. Ballou and McLean were taken to the police station. McLean was later released.

Captain Bulens knew the defendant by reputation. He had heard him discussed many times by police officers in Division 15 who said that he was a "bad one." He had read of the defendant in the State Police Journal. He had seen the defendant's name in State police circulars in connection with the recent wave of gangland killings. He knew the defendant to be an associate of "Buddy" McLean. He

was aware that the defendant had been convicted and had served a prison sentence on a gun carrying charge and that the defendant and McLean were known to carry guns.

In the Superior Court the defendant moved to suppress evidence of the firearm taken when he was searched and to dismiss the indictment on the ground that the search was illegal and unreasonable and violated his constitutional rights. These motions were heard in conjunction with the trial.

The allegation of unreasonable search at once raises the fundamental question whether, considering Ballou's reputation and the other facts they knew about him, Captain Bulens and Detective Ingemi were entitled, for their own protection and for the safety of the public, to ascertain definitely by "patting down" whether he was carrying a firearm.

We make no conclusion that there was probable cause to arrest before obtaining proof of secret possession of the revolver. The point we decide is that the two officers acted reasonably in the steps taken to avoid being shot down and to prevent a sudden breach in the community's defences against crime. We do not depend upon judicial notice of a gang war. The evidence admitted amply showed that Captain Bulens knew of such a war. He further knew that he was looking for one who had achieved prominence in discussions in his own station house; who had gained notoriety in the State Police Journal and in State police circulars in connection with the recent wave of gangland killings; and who was an associate of McLean, a supposed participant in that war. He realized that both men had reputations for carrying guns, and was aware of the defendant's conviction and sentence for gun carrying. Reference to the conviction viewed in perspective with the captain's other information — in itself quite adequate to put an intelligent police officer on his guard — is not a classification of the defendant as an inferior grade of citizen, but it is the contribution of an additional fact of importance entering into the formation of a common sense judgment. See *Commonwealth* v. *Rossetti*, 349 Mass. 626, 633–634.

That the original source of information was an anonymous tip, although intended for a police officer known to the informant, is not of importance.  The tip was effective to send the officers forth in performance of their duties on a dangerous quest well understood by Captain Bulens, who wisely readied his own gun.

The captain's testimony that he considered the defendant to be under arrest before coming within five feet of him and before a word was spoken or any physical restraint imposed was an opinion on a matter of law which does not estop the Commonwealth or foreclose the courts.  *Commonwealth* v. *Lehan,* 347 Mass. 197, 205, 207.  *Commonwealth* v. *Lawton,* 348 Mass. 129, 132–133.  The trial judge in effect so ruled, and correctly.

. Upon the discovery of the revolver the police were confronted with a felony.  G. L. c. 269, § 10.  For this there was probable cause to arrest.  *Commonwealth* v. *Phelps,* 209 Mass. 396, 404.  *Commonwealth* v. *Holmes,* 344 Mass. 524, 525.  *People* v. *Mickelson,* 59 Cal. 2d 448, 450–451, and cases cited.  *People* v. *Rivera,* 14 N. Y. 2d 441, 447, cert. den. sub nom. *Rivera* v. *New York,* 379 U. S. 978.  The officers' continued safety cannot be made dependent upon the presence or absence of a bulge in the defendant's clothing.

"The States are not . . . precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures . . . ." *Ker* v. *California,* 374 U. S. 23, 34.

Any mild indignity or interference with privacy which the defendant experienced was trifling in comparison with the sensible means taken to safeguard human life.  An individual in the defendant's position is guaranteed against undue interference by the requirement that the police officer's belief of the existence of danger must be reasonable.

We reject the assertion that nothing in the evidence sum-

marized in the report suggests that Captain Bulens conducted a "frisk" in order to protect himself. This contention denies to him the quality of elementary human intelligence. His act of unsnapping the top of his holster showed an awareness of peril and that self-defence was in his mind. There is no substance to the argument that he did not recognize the defendant. The captain was accompanied by a detective who did know and did identify the defendant. From that instant the captain had all the information he needed. There is not even occasion to rely upon the elementary rule of composite knowledge of police officers engaged in a coöperative effort, where the knowledge of one may be the knowledge of all. *Commonwealth* v. *McDermott*, 347 Mass. 246, 249. *State* v. *Fioravanti*, 46 N. J. 109, 122–123.

To the questions reported we answer as follows: To the first question, "No." To the second and third questions, "Yes."

*So ordered.*