COMMONWEALTH *vs.* LAWRENCE MCCAULEY.

Middlesex.  March 9, 1981. — May 6, 1981.

Present: GRANT, CUTTER, & GREANEY, JJ.

*Search and Seizure,* Threshold police inquiry.

Where police officers had received information from their dispatcher
   shortly before midnight that an anonymous caller had reported that an
   armed man, described in considerable detail by the caller, was then
   present in a nearby café and had dropped a firearm on the floor more
   than once and where the officers, upon arriving at the café, easily
   identified a man fitting the description, the officers were justified in
   conducting a brief "pat down" search of the man and seizing a pistol
   found in his belt.  [781-784]

COMPLAINT received and sworn to in the Somerville Divi-
sion of the District Court Department on April 22, 1980.

A motion to suppress was heard by *Sherman,* J.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the
Commonwealth.

*Wayne A. Perkins* for the defendant.

CUTTER, J.  McCauley was found guilty in a District
Court on July 1, 1980, of unlawfully carrying on his person
a .22 caliber semi-automatic pistol.  G. L. c. 269, § 10(*a*).
He appealed for a jury trial de novo.  He also filed a motion
to suppress the gun which was taken from him, asserting
that the search of his person when the gun was discovered
was without his consent.  The Commonwealth did not con-
tend that the gun was in plain view.  The judge found the
following facts.

About 11:55 P.M. on April 21, 1980, two Somerville
police officers were in a cruiser near Teele Square.  They
received word to call the station by telephone.  They did so.
The dispatching officer told them (a) that a white male,

five feet, ten inches tall, with a mustache and curly hair was in the Teele Square Cafe; (b) that he was wearing a red, white, and blue sweater; and (c) that he was carrying a firearm which he had dropped on the floor more than once. The station officer said this information "had been received from an anonymous party."

The officers went to the café and soon picked McCauley (from thirty to fifty patrons present) as fitting the description received from the dispatching officer. The officers approached McCauley, asked a female companion to step away, told McCauley to raise his hands above his head, and gave him a "pat down." As a consequence, the officers took from McCauley's left side a .22 caliber pistol "which had been stuffed in a belt attached to" McCauley's trousers.

Prior to the "pat down," McCauley said nothing to the two officers. They did not assert that they had seen the firearm prior to the pat down or that he was acting suspiciously, or that he consented to the pat down. No evidence was offered at the suppression hearing to warrant a finding that the officers were "apprehensive of harm at the time of the" pat down. No guns were drawn. The judge allowed the motion to suppress. The Commonwealth sought interlocutory review. Mass.R.Crim.P. 15(a)(2), 378 Mass. 882 (1979). By stipulation the parties adopted the trial judge's findings as a substitute for a statement of agreed facts under Mass.R.A.P. 8(d), as amended, 378 Mass. 934 (1979).

The Commonwealth relies on *Terry* v. *Ohio*, 392 U.S. 1 (1968), and cases which follow it as justifying the brief inquiry and pat down. That reliance is proper. These officers on patrol in a cruiser had received word from their dispatcher that an armed man, described in considerable detail, was present in the café just before midnight. He had dropped his gun at least twice. The dispatcher had to act on an anonymous telephone report. The hour and the place gave reason for suspicion that the suspect had been drinking in the café. The account of dropping a pistol strongly suggested carelessness with firearms and perhaps even intoxication. The officers had no time to deliberate and promptly

went to the café. There they easily identified McCauley as fitting the detailed description, made a careful, threshold "pat down," and discovered that the anonymous informer was completely right. McCauley was armed.

The facts do not as strongly support the officer's action as those in *Terry* v. *Ohio*, 392 U.S. 1, and *Adams* v. *Williams*, 407 U.S. 143 (1972), but we think that the officers' prompt, restrained, threshold search was justified by the hour, the location of the inquiry, the risks to other patrons, and the specificity of the anonymous report in describing McCauley. The "specificity of the information supplied" may be relevant in determining an informant's credibility. See *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 253 (1974); *State ex rel. H.B., Juvenile*, 75 N.J. 243, 248-249 (1977).

The case seems to us much closer to *Commonwealth* v. *Anderson*, 366 Mass. 394, 397-399 (1974), than to *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 55-56 (1974). This search did not go beyond what was "minimally necessary to learn whether . . . [McCauley was] armed and to disarm him once the weapon [was] discovered." *Commonwealth* v. *Silva*, 366 Mass. 402, 408 (1974).

"The touchstone of . . . analysis [of an inquiry or search] under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security' [citing *Terry* v. *Ohio*, 392 U.S. at 19]. Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Pennsylvania* v. *Mimms*, 434 U.S. 106, 108-109 (1977). Here the police officers, in our opinion, probably could not have done other than substantially what they did and still have complied with their public duty.

The record in this case does not show that anything was known about the identity of the informant, nor does it suggest that the defendant was known to the police in advance of the pat down. The anonymous report did give the policemen sound ground to fear the defendant to be armed and

thus to take no risks of being hurt themselves. It was a matter for the officers' judgment whether further inquiries of bar employees or other patrons would be likely to cause more commotion and create more risks than a direct approach to the defendant in the well filled cafe. Obviously, they were faced with a dilemma, and we conclude that their action was reasonable.

No case in this troublesome area of threshold searches is precisely like any other case and very slight indicia confirming suspicion have often been relied on to support sensible police conduct. Even in the absence of such slight indicia, the police sometimes must take prompt and effective action. Decisions generally supporting these officers' prompt, and only moderately intrusive action, in a great variety of circumstances, include *Commonwealth* v. *Ballou*, 350 Mass. 751 (1966), cert. denied, 385 U.S. 1031 (1967); *United States* v. *Gorin*, 564 F.2d 159, 160-161 (4th Cir. 1977), cert. denied, 434 U.S. 1080 (1978); *United States* v. *Sierra-Hernandez*, 581 F.2d 760 (9th Cir.), cert. denied, 439 U.S. 936 (1978, direct presence of informant); *United States* v. *Mireles*, 583 F.2d 1115, 1117 (10th Cir.), cert. denied, 439 U.S. 936 (1978); *Hetland* v. *State*, 387 So.2d 963 (Fla. 1980); *In re Boykin*, 39 Ill. 2d 617, 618-619 (1968); *State* v. *Jernigan*, 377 So.2d 1222, 1224-1225 (La. 1979), cert. denied, 446 U.S. 958 (1980, dealing with a situation similar to the present case described as presenting "an immediate danger to the public . . . aggravated by its occurrence in an occupied alcoholic beverage outlet"); *State ex. rel. H.B., Juvenile*, 75 N.J. at 248-252. See *People* v. *Taggart*, 20 N.Y.2d 335, 337-340 (1967), modified, 21 N.Y.2d 729, appeal dismissed, 392 U.S. 667 (1968), where Judge Breitel described the officers' dilemma (at 339-340): "There are exigencies affecting life, limb, or grave property damage in which the police receive information of crime, not sufficient to establish probable cause for arrest and incidental search, and yet which, to any reasonable man, demand the taking of police action to prevent serious harm. In such cases it is not enough to say that nothing should be done,

or that, if something is done, the resultant evidence should be suppressed.  To do nothing is to succumb supinely to serious injury to members of the public or to the State itself, sincerely believed to impend, particularly as the test for action is supposed to be what a reasonable man would do under the circumstances . . . .  To tolerate unconstitutional action as a matter of necessity, as some argue, but then to reject use of the evidence obtained, is hardly a proper way to justify illegal conduct as necessary, on the one hand, but to limit on the other hand, the consequences of those actions as illegal."  See Model Code of Pre-Arraignment Procedure § 110.2(4) (1975).  Compare and contrast *People* v. *De Bour*, 40 N.Y.2d 210, 221-226, 232 (1976), where in circumstances much like those in the present case, Judge Breitel joined in an opinion reaching a different result.  The difficulties inherent in this type of case are well illustrated by two very recent cases.  See Judge Wald's sensible recognition that "we do not live in an antiseptic world," in *United States* v. *White*, 648 F.2d 29, 45 (D.C. Cir. 1981).  Compare and contrast *United States* v. *Clay*, 640 F.2d 157, 158-161 (8th Cir. 1981).

Three very recent cases are plainly distinguishable. These officers, because of the information received from the dispatching officer, had at least "a reasonable suspicion, based on objective facts, that" McCauley was "involved in criminal activity" (*Brown* v. *Texas*, 443 U.S. 47, 51 [1979]), that is, the possession of a pistol, in circumstances which might easily prove to be dangerous to others.  Compare and contrast *Brown* v. *Texas*, 443 U.S. at 51-52.  Compare also *Delaware* v. *Prouse*, 440 U.S. 648, 658-663 (1979); *Reid* v. *Georgia*, 448 U.S. 438, 440 (1980).

The order suppressing the pistol as evidence is reversed. The case is remanded to the District Court for further proceedings.

*So ordered.*