COMMONWEALTH *vs.* ROBERT J. FITZGIBBONS.

Suffolk.  October 14, 1986. — December 30, 1986.

Present: ARMSTRONG, QUIRICO, & DREBEN, JJ.

*Practice, Criminal,* Motion to suppress. *Radio Message. Arrest. Probable Cause. Search and Seizure,* Threshold police inquiry, Probable cause, Automobile. *Constitutional Law,* Search and seizure.

Where police officers had received a radio dispatch telling them to be on the lookout for a blue Pinto hatchback automobile bearing a certain Massachusetts registration and being driven outbound from the city by a white male suspected of having pointed a handgun, possibly an automatic weapon, at a group of persons and where the radio dispatch was corroborated in significant part by a vehicle matching the description traveling outbound past the officers minutes after the report, the police conduct in stopping the vehicle, boxing it in with their police cruisers, ordering its occupant out at gunpoint was neither excessive nor so intrusive as to exceed the scope of an investigatory stop governed by the principles articulated in *Terry* v. *Ohio,* 392 U.S. 1 (1968), and, consequently, a firearm seized from the floor of the car in plain view, which gave probable cause for a lawful arrest, and some marihuana seized from the defendant later during an inventory search were not to be suppressed as evidence at his trial. [307-309]

COMPLAINTS received and sworn to in the Boston Municipal Court Department on July 5, 1985.

A pretrial motion to suppress evidence was heard by *George A. O'Toole,* J.

*David B. Mark,* Assistant District Attorney (*John P. Noyes,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

*Charles A. Clifford* for the defendant.

ARMSTRONG, J. The defendant is charged with unlawfully carrying a firearm, G. L. c. 269, § 10(*a*), and possession of marihuana, G. L. c. 94C, § 34. The Commonwealth appeals

from an order of a judge of the Boston Municipal Court allowing the defendant's pretrial motion to suppress the firearm and the marihuana. These had been seized, according to the judge's findings, in the following circumstance.

About 11:00 P.M. on the evening of July 4, 1985, Boston police Officer Carl Nemes and his partner, patrolling in a cruiser, received a radio dispatch telling them to be on the lookout for a blue Pinto hatchback automobile driven by a white man and bearing Massachusetts registration 735-KLW. The driver, according to the dispatch, "had pointed a handgun, perhaps an automatic weapon, at a group of citizens at Marlborough and Arlington Streets." The Pinto was said to be heading outbound on Arlington Street. Officer Nemes, who was nearby, drove the cruiser on what he hoped would be an interception course and within five minutes was passed by a blue Pinto headed in the opposite direction. The registration plate number matched the broadcast. Officer Nemes did a U-turn and followed the Pinto, radioing for assistance. Two other cruisers arrived and together, forming a box around the Pinto, they forced it to the roadside and stopped it. Officer Nemes drew his service revolver and approached the driver's door, ordering the defendant out. The defendant complied. Through the open door Officer Nemes saw an automatic weapon on the floor on the driver's side. He arrested the defendant and seized the firearm. (The marihuana was found in the defendant's left sock later, at the police station, through an inventory search.)

It is apparent from the record that the judge read *Commonwealth* v. *Bottari,* 395 Mass. 777 (1985), as requiring him to rule, on these facts, that the stop of the defendant's vehicle by boxing it in and the approach at gunpoint constituted an arrest, dependent for its validity on antecedent probable cause, and that it could not be justified as a *Terry* stop,[1] which would require only a reasonable and articulable suspicion. We do not think that the *Bottari* decision established an inflexible rule to that effect, and, accordingly, we reverse.

---

[1] *Terry* v. *Ohio,* 392 U.S. 1 (1968).

In the *Bottari* case the Boston police had received a report from an informant[2] that Bottari was carrying a handgun unlawfully and that he could be found at a certain shopping center parking lot in Somerville. His car was particularly described. The Boston police notified the Somerville police, whose officers, some two and a half hours later, went to the lot and saw the car. After a wait of another three quarters of an hour or an hour, Bottari and his companions, not acting suspiciously, approached and entered the parked car. The officers blocked off the car and ordered the men out at gunpoint. The officers then searched the glove compartment and the trunk of the car, where they found unlawful weapons. The Supreme Judicial Court sustained a finding by the trial judge that in these circumstances the stop amounted to an arrest. The decision emphasized that, on the judge's findings, the officers did not fear for their safety or the safety of others at the time they approached the car with guns drawn, and that a different result might be reached in "the presence of other fear-provoking circumstances which are absent here." 395 Mass. at 782.

It is important to observe that the *Bottari* decision did not purport to be laying down a special rule, under the Massachusetts Constitution, more restrictive of *Terry* stops than that formulated in Federal cases decided under analogous provisions of the United States Constitution. To the contrary, the *Bottari* decision cited and relied on Federal decisions (*United States v. Strickler,* 490 F.2d 378, 380 [9th Cir. 1974]; *United States v. Marin,* 669 F.2d 73, 81 [2d Cir. 1982]) which had held gunpoint stops of vehicles to be arrests in the particular circumstances of the cases. It noted and distinguished *United*

---

[2] The court in *Bottari* held that the report did not amount to probable cause under the standards of art. 14 of the Declaration of Rights of the Massachusetts Constitution, as defined in *Commonwealth v. Upton,* 394 Mass. 363, 374 (1985). The Commonwealth makes no contention in this case that the anonymous (so far as we know) tip here did amount to probable cause. The defendant (appropriately in view of the quick confirmation of the tip by the appearance of the defendant headed outbound minutes after the dispatch) expressly conceded in the trial court and concedes here that the police had grounds that rose to the level of reasonable, articulable suspicion under *Terry* analysis.

*States* v. *Jackson,* 652 F.2d 244, 248-250 (2d Cir. 1981), which had held a comparable stop to be justifiable on the facts of that case under *Terry* principles despite the absence of probable cause to arrest.

The *Jackson* case is representative of a well established line of Federal authority holding that the boxing in of a moving vehicle and approach by the police at gunpoint do not as matter of law vitiate a justification of the stop under *Terry* principles. Obviously such stops are highly intrusive. The pertinent inquiry is whether the degree of intrusiveness is reasonable in all the circumstances.

In *United States* v. *Hensley,* 469 U.S. 221 (1985), police had sighted a car whose occupants were thought to be armed and dangerous. *Id.* at 223-224. They pulled the car over with flashing lights, approached the car with guns drawn, and ordered the occupants out of the car. A unanimous court held that the police "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. The . . . officers' conduct was well within the permissible range for the context of suspects who are reported to be armed and dangerous." *Id.* at 235. The *Hensley* case was analyzed as a *Terry* stop, not one grounded in probable cause.

In *United States* v. *Jones,* 759 F.2d 633 (8th Cir.), cert. denied, 474 U.S. 837 (1985), the court held that blocking did not turn a stop into an arrest, noting that "[b]locking generally will be reasonable when the suspect is in a vehicle because of the chance that the suspect may flee upon the approach of police with resulting danger to the public as well as to the officers involved." *Id.* at 638.[3] The court also said: "An approach to a car by officers with guns drawn does not elevate an investigative stop into an arrest, if the police action is reasonable under the circumstances." *Ibid.*

In *United States* v. *Jackson, supra,* police officers stopped a car headed outbound from the scene of a bank robbery which

---

[3] The same was implicitly held in *Commonwealth* v. *Riggins,* 366 Mass. 81 (1974), where a blocking stop by two police cruisers was treated as justified under *Terry* principles.

had taken place five minutes earlier. The driver looked similar in age and complexion to the reported robber[4] and seemed purposefully unconcerned with the police activity around him. The stop of the vehicle and the approach with a drawn gun were held not to convert the stop into an arrest. "Although the drawing of a weapon may be a significant factor in determining whether a suspect is under arrest, it is not dispositive of the issue." 652 F.2d at 249. "To allow such protective measures to transform an investigative stop into an arrest would create a dangerous dilemma for the police officer in those situations, like this one, where suspicion does not rise to the level of probable cause. If the officer approaches a suspected robber with his gun still in his holster, he increases the risk that he will be shot. If, on the other hand, he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an illegal arrest. We decline to impose such a Hobson's Choice on our law enforcement personnel." *Id.* at 249-250. To the same effect, see the numerous cases cited in *United States* v. *Ceballos,* 654 F.2d 177, 183 (2d Cir. 1981).

Thus, proceeding from the Fourth Amendment's overriding command of reasonableness, both Federal and State cases have recognized the right of police officers to adapt to the special public safety considerations that characterize car stops. These considerations are several. First, "[a] motorist does not have the same communicative potential with a police officer [that] a pedestrian has. The pedestrian being in more or less face-to-face contact with the confronting officer is able to assess the officer's purpose and determine whether he is free to continue on his way. The motorist, however, is effectively separated from anyone who is not in his automobile." *People* v. *Lang,* 66 Ill. App. 3d 920, 924 (1978). Second, when an officer in a patrol car motions a suspect to pull over, the suspect, particularly if guilty of serious crimes, might flee, starting a high-speed chase endangering bystanders over a wide area. See, e.g., *United*

---

[4] The officers soon realized that he differed in weight and clothing. The man described in the broadcast report was hiding in the trunk.

*States* v. *Harley,* 682 F.2d 398 (2d Cir. 1982) (ninety-mile per hour chase down Harlem River Drive). A fleeing pedest- . rian, by contrast, generally poses little risk to the general public. Third, when approaching a stopped car, a police officer is to some degree impaired in seeing whether a person therein may be drawing a gun.

Cognizant of these special public safety considerations, courts have held that the boxing in of a vehicle is only one factor to consider in determining whether a car stop constitutes an arrest, *United States* v. *Vargas,* 633 F.2d 891, 895-896 (1st Cir. 1980). Similarly, "there is no hard and fast rule concerning the display of weapons. *Terry* stops are narrow but fluid exceptions to the warrant and probable cause requirements of the Fourth Amendment. What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed. The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness." *United States* v. *Harley, supra* at 402.

The distinguishing feature of a *Terry* stop is that the intrusion is temporary, and in degree it is not excessive or incommensurate with the accomplishment of its purpose. *Florida* v. *Royer,* 460 U.S. 491, 500 (1982). "*Terry* and *Royer* state a 'principle of proportionality.'" *Commonwealth* v. *Borges,* 395 Mass. 788, 794 (1985) (decided the same day as *Bottari*). Without exceeding *Terry* guidelines, the police may do what is necessary to command the suspect's attention and bring him to a stop, *United States* v. *Gomez,* 633 F.2d 999, 1006 (2d Cir. 1980); *Terry* v. *Ohio,* 392 U.S. at 32-33 (Harlan, J., concurring), and to protect themselves and the public from unnecessary exposure to risk of injury. *Commonwealth* v. *Ballou,* 350 Mass. 751 (1966), cert. denied, 385 U.S. 1031 (1967).[5] "The degree of

---

[5] The *Ballou* case was not overruled by the *Bottari* case but was distinguished on its facts. See *Bottari,* 395 Mass. at 782 n.5. "[A]lthough *Ballou* was decided prior to *Terry* v. *Ohio,* . . . the court treated the *Ballou* incident as a stop and frisk justified on the facts known to the police, including their rea-

intrusiveness on a citizen's personal security, including considerations of time, space, *and force,* must be proportional to the degree of suspicion that prompted the intrusion." *Commonwealth* v. *Borges, supra* at 794, citing *Bottari* (emphasis supplied). Under State as well as Federal law, it is not the use of force per se but, rather, the "use of *excessive force* in detaining a suspect [that] may raise the nature of a seizure from an investigatory stop to the level of an arrest requiring probable cause." *Id.* at 792 n.3, 793 (describing the holding in the *Bottari* case).

We turn then to the question whether the blocking of the defendant's car and the approach by an officer with a gun drawn was so intrusive as to be tantamount to an arrest. Resolution of this question, by its nature, must depend upon the particular facts of each case. *United States* v. *Ceballos,* 654 F.2d at 182. Fortunately, the judge has made detailed subsidiary findings, from which this court may appropriately exercise its judgment in drawing fair inferences.

We start from the proposition, conceded by the defendant (see note 2, *supra*), that the police had grounds for a *Terry* stop.[6] The radio dispatch, corroborated in significant part by the presence of the defendant's car traveling outbound minutes after the report, indicated the possible commission of two serious crimes: carrying a handgun unlawfully, which, under a well

---

sonable concern for their own safety. *Commonwealth* v. *Ballou, supra* at 756-757." *Id*. It is worth noting, also, that the *Ballou* decision makes clear that the officers' concern for their own safety is a fact that can be inferred from all the circumstances: it does not necessarily depend on direct testimony. "We reject the assertion that nothing in the evidence . . . suggests that Captain Bulens conducted a 'frisk' in order to protect himself. This contention denies to him the quality of elementary human intelligence. His act of unsnapping the top of his holster showed an awareness of peril and that self-defense was in his mind." *Commonwealth* v. *Ballou, supra* at 756-757.

[6] The concession makes it unnecessary for us to consider whether the dispatcher's testimony might otherwise have been necessary to establish the grounds for the stop. See *Commonwealth* v. *Antobenedetto,* 366 Mass. 51 (1974); *Commonwealth* v. *Wainio,* 7 Mass. App. Ct. 863 (1979); Smith, Criminal Practice and Procedure § 121, at 88 & n.4 (2d ed. 1983). See also *United States* v. *Hensley,* 469 U.S. at 233.

publicized Massachusetts law (G. L. c. 269, § 10[a]), guarantees a minimum mandatory sentence of a year in prison, and assault with a dangerous weapon, which, under G. L. c. 265, § 15B(b), carries a term of up to five years in a State prison. The certainty of imprisonment if guilt was established made flight a realistic possibility. The defendant's reported behavior was indicative of impulsiveness. In the circumstances it is not reasonable to find that the police used excessive force by anticipating the possibility of flight and guarding against it by boxing in the defendant's car.

An approach with drawn guns is generally thought excessive in the absence of any suggestion that the defendant is armed or other circumstances suggesting the possibility of violence. Here, the defendant not only had been reported to be armed, possibly with an automatic weapon (as turned out to be the fact) but, in a point that distinguishes this case sharply from the facts in *Bottari,* he was reported to have drawn the weapon and, inferentially, threatened a group of persons with it, only minutes prior to the stop. The police could not calibrate finely the danger they were facing in approaching the car, but, in our view, on the limited leads they had, the police officers were fully justified in preparing for the worst case: an impulsive, possibly violent resistance to arrest by one armed with an automatic weapon whose motions were largely obscured from their view. Until the defendant was out of the car[7] with hands raised, the risk justified the officer's approaching the driver's door with his revolver drawn and aimed. The intrusion was obviously great, but it was momentary in duration and, under the rule of proportionality, was not excessive to the risk

---

[7] In *Pennsylvania* v. *Mimms,* 434 U.S. 106, 109-111 (1977), it was held that, if the stop of a vehicle is lawful, the police officers may order the driver to get out of the car even in the absence of reason to think he may be armed. Compare *Commonwealth* v. *King,* 389 Mass. 233, 243-244 (1983), where the court held excessive an order that a passenger get out of a stopped car after the police officer had finished checking licenses and registration and had found nothing suspicious.

the officer was facing at that moment. The intrusiveness did not, therefore, exceed the scope of a *Terry*-type stop.[8]

It follows that the seizure of the automatic weapon was lawful, as it lay on the floor of the car, in plain view through the open door. *Commonwealth* v. *Moynihan,* 376 Mass. 468, 472 (1978). The weapon gave probable cause for the ensuing arrest. No contention is made that, if the arrest was lawful, the police did not lawfully conduct the inventory search that disclosed the packet of marihuana.[9]

The order allowing the defendant's motion to suppress is reversed, and the case is remanded for trial.

*So ordered.*

---

[8] Subsequent to the argument of this appeal, the Supreme Judicial Court decided *Commonwealth* v. *Sanderson,* 398 Mass. 761 (dated December 10, 1986). Although the stop in that case was held, on the facts found, to be an arrest, the principles applied here are not at variance with the principles applied there. In *Sanderson* the police (1) detained the suspect for forty minutes, while (2) additional police officers, ultimately totaling six, plus a police dog, gathered, in circumstances where (3) "the officers had no reason to believe the defendant was armed [and thus] did not frisk him or draw their weapons." *Id.* at 764. The court concluded that "[c]learly the police . . . were detaining the suspect for purposes of making a search for contraband." *Id.* at 767, quoting from *Commonwealth* v. *Borges,* 395 Mass. at 798 (Hennessey, C.J., concurring).

[9] The judge did not make a finding that the inventory search of the defendant's person at the police station was conducted in accordance with standard police procedures, see *Commonwealth* v. *Wilson,* 389 Mass. 115, 117 (1983); compare *Commonwealth* v. *Ierardi,* 17 Mass. App. Ct. 297, 299 n.1 (1983); but this only reflects the fact that the defendant's motion to suppress and his supporting memorandum of law raised no question in that respect. Contrast *Commonwealth* v. *Ford,* 17 Mass. App. Ct. 505 (1984), *S.C.,* 394 Mass. 421 (1985), as to inventory searches of automobiles.