## COMMONWEALTH vs. RUI BARROS.

No. 99-P-16.

Plymouth. March 21, 2000. - July 10, 2000.

Present: KASS, GILLERMAN, & JACOBS, JJ.

Further appellate review granted, 432 Mass. 1109 (2000).

*Search and Seizure,* Protective frisk, Threshold police inquiry. *Constitutional Law,* Search and seizure. *Firearms.*

Police officers, acting on the basis of an informant's tip that he had seen an individual with a handgun, did not have a lawful basis to detain and search the defendant, where the mere fact of possession or carrying of a weapon, without more, did not constitute an objectively reasonable suspicion of criminal activity to conduct a stop and frisk: the defendant's motion to suppress the evidence seized should have been allowed. [616-620] JACOBS, J., concurring.

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on July 29, 1998.

A pretrial motion to suppress evidence was heard by *Richard D. Savignano,* J., and the case was heard by *David G. Nagle, Jr.,* J.

*Sheila T. Curran* for the defendant.

*Bridget Norton Middleton,* Assistant District Attorney, for the Commonwealth.

KASS, J. Once again we consider the constitutional limits on police when they conduct a stop and frisk on the basis of an informant's tip that he has seen someone in possession of a handgun. See *Commonwealth* v. *Couture,* 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990); *Commonwealth* v. *Alvarado,* 423 Mass. 266, 269 (1996); *Commonwealth* v. *Berment,* 39 Mass. App. Ct. 522 (1995); *Commonwealth* v. *Foster,* 48 Mass. App. Ct. 671, 673-677 (2000); and, most recently, *Florida* v. *J.L.,* 120 S. Ct. 1375 (2000). "No case in this troublesome area of threshold searches is precisely like any other case . . . ." *Commonwealth* v. *McCauley,* 11 Mass. App. Ct. 780, 783 (1981).

On the basis of the case law as developed, we are constrained to decide that the police in this case had insufficient basis to detain and search the defendant Rui Barros when they did, and that he was entitled to allowance of his motion to suppress the handgun and ammunition taken by the police from him. Barros was convicted at a jury-waived trial in District Court of carrying a firearm without a license (G. L. c. 269, § 10[*a*]), and possessing ammunition without a license (G. L. c. 259, § 10[*c*]).[1]

1. *Facts and procedural background.* These are the facts found by the motion judge, supplemented by the uncontroverted testimony of Brockton police Officer Christopher McDermott, the Commonwealth's only witness at the suppression hearing.[2] At approximately 5:30 P.M. on July 28, 1998, Officer McDermott was in uniform and driving his marked police cruiser in Brockton when a white, well-dressed, middle-aged man in a Dodge pick-up truck, whom he had never before met, motioned for him to stop. Both men got out of their vehicles and the informant told Officer McDermott that he wished not to identify himself, beyond that he was a businessman who worked on Main Street, but that he had information he wanted to give to the police.

The informant, appearing somewhat concerned, then told Officer McDermott that he had just seen someone pull a handgun from his waistband, show[3] it to his friends, laugh, and then return the gun to his waistband. He described the gun-toting

---

[1]The trial judge dismissed as duplicative a count of possession of a firearm in violation of G. L. c. 269, § 10(*h*).

[2]The defendant did not testify at the suppression hearing, but did submit an affidavit.

[3]On direct examination, Officer McDermott testified that the informant said that the man had "brandish[ed]" the gun, a phrase adopted by the motion judge in his findings. When cross-examined on this point, however, Officer McDermott admitted that the informant had not used the word "brandish": "His words were he saw him pull a pistol from his waistband." The officer explained further:

*Q.* "He didn't tell you he saw him point it at anybody?"

*A.* "No."

*Q.* "Or wave it around in the air?"

*A.* "No."

*Q.* "Basically, pulled it from his waistband and showed it to people that he was with?"

individual, whom he had seen in the vicinity of Main and Hancock Streets, as a light-skinned Cape Verdean male, about five feet, six inches tall, wearing a blue baseball cap, a blue and white T-shirt, and blue jeans.

After receiving the tip, Officer McDermott radioed for back-up and then proceeded to the area described. When he arrived there, approximately eight minutes after having been flagged down by the informant, Officer McDermott saw a group of Cape Verdean men walking along Main Street. One of them matched the informant's description. Officer McDermott did not see a gun. As he pulled his cruiser alongside the man with a blue baseball cap, blue and white T-shirt, and jeans, Officer McDermott made eye contact with him. The man with the blue cap was the defendant.

Officer McDermott recognized the defendant because he had previously told him not to hang out in front of stores on Main Street. Still in his patrol car and about five feet from the defendant, Officer McDermott said to him, "Hey you . . . I wanna speak with you." The defendant turned away and continued walking with his companions in the same direction as he had been. Thus ignored, Officer McDermott stopped his patrol car, got out, pointed at the defendant (who was now about six feet away), and said to him, "Hey you. I wanna talk to you. Come here." By this time, two back-up officers had arrived. The defendant, who had apparently turned to see Officer McDermott (and presumably the arriving back-up), broke eye contact, turned away from Officer McDermott, and stopped walking.

At that point, Officer McDermott saw the defendant move his hands out of view and toward his front waistband area. In fear and concerned for his safety and the safety of those around

---

*A.* "That's correct."

The motion judge's findings of fact are binding on us absent clear error. *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980). The meaning of the word "brandish" — "to wave or flourish (a weapon, for example) menacingly," American Heritage Dictionary 230 (3d ed. 1992) — does not square with Officer McDermott's testimony. The finding that the defendant "brandished" the gun is without support in the record. But see *Commonwealth* v. *Foster, supra* at 676 n.7 (officers could have understood "display" to mean to "flaunt or exhibit ostentatiously").

him,[4] the officer drew his service revolver and ordered the defendant to put his hands where they could be seen. After a second instruction to show his hands, the defendant complied, and complied as well with the next command, to turn around.[5] But, having turned to face the officers and with his hands above his head, the defendant began to back away, whereupon Officer McDermott holstered his gun, grabbed the defendant, placed him in handcuffs, and brought him to the police cruiser. A frisk of the defendant produced a handgun — a Colt .25 — loaded with six rounds of ammunition, found in his front waistband. After recovering the gun, Officer McDermott asked the defendant if he had a license to carry it, to which the defendant responded, "No."[6]

The defendant was arrested and, on October 4, 1998, his motion to suppress evidence — the gun and ammunition — was denied. The judge, in denying the motion, found Officer McDermott's testimony "credible in all respects." See *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979), cert. dismissed, 445 U.S. 39 (1980). He ruled that the encounter between the officer and the defendant was permissible, the defendant not being seized until Officer McDermott drew his gun. Acutely aware of the public policy considerations implicated by the case, the judge noted that "[t]he officer was justified in undertaking the precautionary measures that he did and he was not required to gamble with the safety of himself or others that evening." The bench trial at which the defendant was convicted followed on November 16, 1998.

2. *When the defendant was seized.* If a seizure of the defendant did not occur until Officer McDermott drew his gun following the defendant's hand motions toward his waistband, then the motion to suppress was correctly denied, for then the officer was reasonably in fear for his safety. It had appeared to him that the defendant was about to reach for a weapon that could be used against him. Officer McDermott had just heard

---

[4]Besides the defendant and Officer McDermott, others present at the scene included the defendant's compatriots (some of whom had fled by this point), the back-up officers, and several bystanders who were sitting on their porches.

[5]Officer McDermott was apparently the only one issuing commands. Officers Nickerson and Paul were on the scene, located somewhere behind Officer McDermott.

[6]The defendant had not yet been read his Miranda rights when questioned at the scene.

that a man in that area fitting the defendant's description had a gun in his waistband.

When investigating an individual whom they reasonably believe to be armed and dangerous, the police may frisk that individual for their safety and the safety of others, and a weapon found during such a search is admissible in evidence. *Commonwealth* v. *Fraser*, 410 Mass. 541, 544-545 & n.4 (1991). See *Commonwealth* v. *Anderson*, 366 Mass. 394, 400 (1974) (anonymous tip that defendant, armed and dangerous, was trafficking drugs); *Commonwealth* v. *McCauley*, 11 Mass. App. Ct. 780, 781 (1981) ("The account of dropping a pistol strongly suggested carelessness with firearms and perhaps even intoxication"); *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 307 (1986) (defendant had pointed gun at group of people); *Commonwealth* v. *Johnson*, 36 Mass. App. Ct. 336, 337 (1994) (defendant, reportedly carrying a handgun, angrily shouting obscenities at a man and police, was "not wholly in control of herself"). Contrast *Commonwealth* v. *Toole*, 389 Mass. 159, 160 (1983) (troopers did not fear for their safety); *Commonwealth* v. *Couture*, 407 Mass. at 179-181 (no evidence that defendant was acting suspiciously or that police officer feared for his safety); *Commonwealth* v. *Alvarado*, 423 Mass. at 270 (no showing of imminent danger).

The case stands in a different posture, however, if the defendant was seized at some point prior to his reaching toward his front waistband — that is, if at that prior point, in view of all the circumstances, the defendant, as a reasonable person, would have thought that he was not free to leave.[7] *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980). *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985). *Commonwealth* v. *Stoute*, 422 Mass. 782, 786-787 (1996). See 4 LaFave, Search & Seizure § 9.3(d), at 127-128 (3d ed. 1996).

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry* v. *Ohio*, 392 U.S. 1, 19 n.16 (1968). For example, a police officer may approach a citizen in

---

[7]Obviously, a seizure occurs when the police use physical force to detain an individual. *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 387 n.5, cert. denied, 515 U.S. 1146 (1995), citing *California* v. *Hodari D.*, 499 U.S. 621, 624-625 (1991).

the street and engage him in conversation, even ask him questions, without implicating the individual's constitutional rights. *Id.* at 34 (White, J., concurring). *United States* v. *Mendenhall, supra* at 553. *Commonwealth* v. *Fraser, supra* at 543. When, however, "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry* v. *Ohio, supra* at 16.

In the instant case, when Officer McDermott initially confronted the defendant with the request, "Hey you . . . I wanna speak with you," the defendant was not seized. That was a request to engage in conversation and within the realm of "personal intercourse" described by *Terry* v. *Ohio, supra,* as not implicating constitutional rights. The defendant was free to decline the officer's request to converse and continue on his way, and he did precisely that. *Terry* v. *Ohio, supra* at 34 (White, J., concurring) ("Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way").

But, when Officer McDermott, rebuffed, followed up — "Hey you. I wanna talk to you. Come here." — the defendant was seized; he reasonably would have thought that he was not free to leave.[8] It is instructive to recall the details accompanying that command. Officer McDermott was in uniform, had stepped out of his marked cruiser, and had pointed at the defendant. The command had been delivered in the presence of two other policemen, who had arrived on the scene as back-up. Objectively, a reasonable person in those circumstances would not have felt free to leave. The question that follows is whether the officer at that point had a lawful basis for restraining the defendant. Once the police have encumbered a person's freedom of movement, i.e., made a stop, they provoke constitutional scrutiny. *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981).

3. *Whether reasonable suspicion to make a stop existed.* To make a stop that is lawful under the Federal[9] or State[10] Constitution, an officer must have an objectively reasonable suspicion of

---

[8]The Commonwealth in its brief and at oral argument contends that the defendant's position at the suppression hearing was that the seizure occurred only when Officer McDermott drew his gun. The transcript of the suppression hearing suggests a broader attack on the stop and frisk, including when the officer said, "Come here."

[9]Fourth and Fourteenth Amendments.

[10]Art. 14 of the Declaration of Rights.

criminal activity. *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984). *Commonwealth* v. *Lyons*, 409 Mass. 16, 18 (1990). *Commonwealth* v. *Alvarado*, 423 Mass. at 269. *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 65-66 (1997). "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida* v. *J.L.*, 120 S. Ct. at 1379.

No doubt, "[w]hen a tip, such as the one received here, concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials." *Commonwealth* v. *Stoute*, *supra* at 790. See *Commonwealth* v. *Fraser*, *supra* at 544-545 n.4. "Would society not hold the officers severely to account if they did not question [potentially gun-toting individuals] and, thereafter, someone were shot?" *Commonwealth* v. *Berment*, 39 Mass. App. Ct. 522, 530 (1995) (Kass, J., dissenting). See *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 680 (2000) (Jacobs, J., concurring). Gun violence and the number of guns on the streets, particularly those in the hands of young people, present a serious hazard to police officers and the public. See *Commonwealth* v. *Foster*, *supra* (Jacobs, J., concurring).

Nevertheless, until the Legislature says otherwise, carrying a gun in Massachusetts is not a crime. *Commonwealth* v. *Alvarado*, 423 Mass. at 269. "Carrying a firearm without a license (or other authorization) is. G. L. c. 269, § 10(*a*)." *Ibid.* A report that someone is carrying a gun does not by itself constitute reasonable suspicion to conduct a stop and frisk of that individual. *Id.* at 270. See *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990).

What we are left with in the instant case is that the defendant showed a handgun to his friends, laughed, and tucked it back on his person. There is no evidence that the defendant was about to commit a crime with the handgun. The *Alvarado* opinion is explicit that the police may not stop and frisk on the basis of the statistical likelihood that the person carrying the weapon is unlicensed so to do. *Commonwealth* v. *Alvarado*, *supra* at 270-271. Were the defendant and his friends so apparently young that the police could reasonably assume they were not of age to obtain a license to carry a firearm, that would be an objectively reasonable suspicion that the defendant was carrying unlawfully, but Officer McDermott's testimony and the motion judge's findings refer to the defendant as one of a group of Cape Verdean men and we cannot draw an inference that the defendant

was apparently a minor. Nor did the informant report or Officer McDermott observe "any strange, furtive, or suspicious behavior . . . that could infuse otherwise innocent activity with incriminating aspect in the discerning eye of an experienced police officer." *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. at 71. See *Commonwealth* v. *Couture*, *supra* at 180. The record does not set forth that the locale where the defendant and his companions were "hanging out" was a place where violence or crime were concentrated. *Commonwealth* v. *Foster*, 45 Mass. App. Ct. at 674-677.

It is surely a source of frustration to law enforcement authorities that they may not play a hunch based on experience and street savvy. As we have said in this opinion, it was good police work to respond to the tip. The police might have seen conditions suggestive of a crime happening or about to happen. Their surveillance alone might have had a salutary effect. In a free society, the balance between the public interest and individual freedom from governmental interference tilts in favor of individual freedom. *Brown* v. *Texas*, 443 U.S. 47, 52 (1979).

The order denying the defendant's motion to suppress is vacated and an order shall be entered allowing that motion. The judgment of conviction is reversed.

*So ordered.*

JACOBS, J. (concurring). I write to emphasize that the "unique and broadly recognized hazards to police officers and the public presented by guns in the streets," *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 680 (2000) (Jacobs, J., concurring), call not only for considerable caution on the part of police but also for careful and thorough prosecution.

Here, the hearing evidence never alluded to the apparent age of the defendant. The complaint filed after his arrest states his date of birth as August 27, 1980, indicating that he was 17 years, 11 months old when Officer McDermott confronted him. At that time, G. L. c. 140, § 131, prohibited a person under 18[1] years' of age from being issued a license to carry firearms. It, therefore, would have been proper at the hearing to inquire of

---

[1]The age of eligibility was raised to 21 years of age by St. 1998, c. 180, § 41, approved on July 23, 1998.

Officer McDermott, or any other officer or witness at the scene, as to the appearance of the defendant in terms of age. A finding by the judge, based upon a response to that question, that the defendant reasonably appeared to be under the age of 18, would sustain an inference of illegally carrying a firearm. See G. L. c. 269, § 10; *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 70 n.10 (1997); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 119 (1998). Given that there are few more dangerous street scenarios than that of an adolescent with a gun, that inference would be sufficient to support a reasonably based stop and frisk.