COMMONWEALTH *vs.* VESNA SAN.

No. 04-P-703.

Bristol. January 4, 2005. - March 24, 2005.

Present: GRASSO, COWIN, & GRAHAM, JJ.

*Constitutional Law,* Reasonable suspicion, Search and seizure, Investigatory stop. *Search and Seizure,* Reasonable suspicion, Motor vehicle, Protective sweep, Threshold police inquiry. *Threshold Police Inquiry.*

A District Court judge erred in granting a criminal defendant's motion to suppress physical evidence and statements resulting from police officers' warrantless stop and subsequent frisk of the defendant and protective sweep of the van next to which he was standing, where the police possessed a reasonable suspicion, based on specific and articulable facts, that the van's occupants and the defendant were acting in concert in a crime; where the actions of the police were proportional to the circumstances; and where the police had a reasonable apprehension of danger that justified the protective sweep of the van and the exit order and frisk of the van's occupants. [192-194]

COMPLAINT received and sworn to in the Fall River Division of the District Court Department on May 23, 2003.

A pretrial motion to suppress evidence was heard by *Lance J. Garth,* J.

A motion for leave to prosecute an interlocutory appeal was heard by *Francis X. Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to this court.

*Sharon L. Sullivan-Puccini,* Assistant District Attorney, for the Commonwealth.

*Paul J. Machado* for the defendant.

GRASSO, J. A judge of the District Court allowed the defendant's motion to suppress physical evidence and statements resulting from the warrantless stop and subsequent frisk of the defendant and protective sweep of the van in which he

was a passenger. The matter comes before us on the Commonwealth's interlocutory appeal, allowed by a single justice of the Supreme Judicial Court pursuant to Mass.R.Crim.P. 15(b), as appearing in 422 Mass. 1501 (1996), and reported to this court for determination. We reverse, as we conclude that the District Court judge erred in his application of law to the facts found at the evidentiary hearing. "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). See *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002) (in reviewing ruling on motion to suppress, we accept motion judge's subsidiary findings of fact absent clear error, but review independently ultimate findings and conclusions of law).

1. *Facts.* The motion judge's findings and uncontroverted evidence adduced at hearing establish these underlying facts. See *Commonwealth* v. *Santiago*, 410 Mass. 737, 738 n.2 (1991); *Commonwealth* v. *Scott*, 440 Mass. at 643-644 nn.3-4. At about 1:00 A.M., Roland Souza and his wife were awakened by voices coming from their kitchen. Duly alarmed, they telephoned the Fall River police. In response to a police broadcast of a break in progress, Officers Jacobs and Pacheco arrived at the Souza home within two minutes. Mr. Souza told the police that he had just seen a male wearing a red football-style jersey with the number 20 or 30, a red baseball cap, and jeans leaving the area, running west on Woodman Street toward Bay Street. The officers immediately broadcast the man's description and direction of travel.

Officer Jacobs drove his cruiser in the direction described by Mr. Souza, while Officer Pacheco proceeded on foot through neighbors' yards. Cindy Garant, who lived three or four houses from the Souzas, told Officer Pacheco that she had seen a man running down Woodman Street toward Bay Street. She stated that "prior to all this taking place," she had seen a black van circling the area, and that the van had proceeded down Bay Street traveling south towards Mt. Hope Avenue.

Officers Jacobs and Pacheco broadcast the additional information provided by Ms. Garant, and returned to the Souza residence

where the Souzas provided further details.[1] Mr. Souza related that he had found the kitchen area disturbed, with cupboards and drawers open and the sliding glass door leading to the back yard ajar. He also heard a car alarm sounding, and when he looked outside, he saw the man in the red jersey sitting in the Souzas' vehicle. The man then jumped out and ran off. Mrs. Souza amplified that she was awakened by a male voice talking to someone else.

While speaking with the Souzas (and within fifteen to thirty minutes of his initial response to the Souza residence), Officer Jacobs received a radio communication from Sergeant O'Connell. O'Connell told Jacobs that he had located a black van and a man that matched the description of the intruder in the area of Rockland and South Main Streets about two miles from the Souzas' home. The man, who was wearing a red jersey with a number on it, a red baseball cap, and jean shorts, was standing on the outside of the van. Traffic in the area was extremely light at that time of night.

As Sergeant O'Connell radioed for backup, the man walked away, and the van headed east on Hamlet Street, where it traveled a couple of hundred feet and pulled into a driveway. Sergeant O'Connell followed and pulled his cruiser behind the van, blocking its exit.

Officers Jacobs and Pacheco proceeded immediately to the scene where Jacobs saw the van, with two males inside, surrounded by five police officers. Within seconds, another police cruiser arrived with the man in the red jersey.

The police began a protective sweep of the van for weapons. On opening the sliding door to the van, Officer Barbosa saw a meat cleaver in the middle row. During the course of the protective sweep, Officer Pacheco noted a Sony remote control on the rear seat of the van.[2] From their observations at the Souza residence, Officers Jacobs and Pacheco recalled that the Souzas

---

[1] Although the judge made no express finding of fact on the point, it was uncontroverted that while officers were inside the Souza residence they observed that the Souzas were installing a Sony "surround sound" system. See note 3, infra.

[2] The parties agree that the motion judge misstated the sequence of facts when he found that the police issued an exit order to the passengers before seeing the cleaver. The difference is inconsequential to our decision. If the

were installing a Sony "surround sound" system. Consequently, they called the Souzas to the scene to view this item. After the Souzas arrived and identified the Sony remote control as their property, the defendant was placed under arrest.

2. *Discussion.* At the motion hearing, the defendant focused on the propriety of the stop of the van, the exit order, and the frisk of the van's occupants and the sweep of its interior. The motion judge was correct in concluding that the information on which the police acted possessed sufficient indicia of reliability. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 20-22 (1990). However, he erred in concluding that the facts and circumstances did not amount to a reasonable apprehension of danger to the police and that, consequently, probable cause and exigent circumstances were required to enter the van.

Here, when Sergeant O'Connell blocked the van from exiting the driveway, the police possessed more than a mere hunch. At the time of the stop, the facts known to the police amounted to a reasonable suspicion that the occupants of the black van might have been involved in the break into the Souza home. The break occurred in the early morning hours, and the voices in the kitchen gave reason to believe that there was more than one intruder. A man dressed in a red jersey and other specifically described attire had fled the scene, and a neighbor had observed a black van circling the block before it headed away from the scene. See *Commonwealth* v. *Wren*, 391 Mass. 705, 708 (1984). Within fifteen to thirty minutes, and within a mile or two of the Souza residence, the police observed a man matching the description of the intruder standing alongside a van similar to that seen circling the Souzas' neighborhood. See *Commonwealth* v. *Pandolfino*, 33 Mass. App. Ct. 96, 98-99 (1992). In these circumstances, the police possessed a reasonable suspicion, based on specific and articulable facts, that the van's occupants and the man in the red jersey were acting in concert in the

police had reasonable suspicion to believe the individuals in the van were involved in the Souza home invasion, as we conclude they did, there was an objectively reasonable apprehension of danger that justified an exit order to the passengers and a protective sweep of the vehicle. See *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999) ("it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns").

break. The police were justified in detaining the van and its occupants, as well as the man in the red jersey, in order to confirm or dispel this suspicion. See *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 58 (1974); *Commonwealth* v. *White,* 422 Mass. 487, 496-497 (1996); *Commonwealth* v. *Johnson,* 49 Mass. App. Ct. 273, 275 (2000).

Moreover, the blocking of the van, the sweep of the van's interior and the frisk of its occupants (including the defendant), and the subsequent detention of the defendant so that the Souzas might identify the Sony remote control was proportional to the circumstances. See *Commonwealth* v. *Moses,* 408 Mass. 136, 141-142 (1990), quoting from *Commonwealth* v. *Borges,* 395 Mass. 788, 794 (1985) (degree of intrusiveness must be "proportional to the degree of suspicion that prompted the intrusion"). Blocking a motor vehicle suspected of involvement in a crime "generally will be reasonable when the suspect is in [the] vehicle because of the chance that the suspect may flee upon the approach of police with resulting danger to the public as well as to the officers involved." *Commonwealth* v. *Fitzgibbons,* 23 Mass. App. Ct. 301, 304 (1986), quoting from *United States* v. *Jones,* 759 F.2d 633, 638 (8th Cir.), cert. denied, 474 U.S. 837 (1985).

Police officers are entitled to take reasonable precautions for their protection. See *Commonwealth* v. *Willis,* 415 Mass. 814, 820 (1993). "[W]hen approaching a stopped [vehicle], a police officer is to some degree impaired in seeing whether a person therein may be drawing a gun." *Commonwealth* v. *Fitzgibbons,* 23 Mass. App. Ct. at 306. Given the crime under investigation, a nighttime home invasion, and the inability otherwise to determine whether the van's occupants were armed, there existed a reasonable apprehension of danger that justified the protective sweep of the vehicle and exit order and the frisk of the van's occupants. See *Commonwealth* v. *Santana,* 420 Mass. 205, 213 (1995) ("popped" ignition supported suspicion that vehicle was stolen and justified exit order); *Commonwealth* v. *Farmer,* 12 Mass. App. Ct. 961, 962 (1981) (reasonable for police investigating suspected burglary to question suspects outside of vehicle, "where they would not have access to weapons or means of escape"). See also *Commonwealth* v.

*Almeida,* 373 Mass. 266, 272 (1977) (investigative search may reasonably extend into interior of vehicle so long as limited in scope to protective end).

Discovery of the Sony remote control during the sweep of the van was a plain view observation whose potential incriminating character was immediately apparent. See *Commonwealth* v. *Santana,* 420 Mass. at 211. This discovery reasonably supported a detention of the van's occupants pending arrival of the Souzas, and the defendant does not argue otherwise.[3] See *Commonwealth* v. *Salerno,* 356 Mass. 642, 646-647 (1970); *Commonwealth* v. *Barros,* 425 Mass. 572, 583-584 (1997); *Commonwealth* v. *Crowley,* 29 Mass. App. Ct. 1, 5 (1990).

*Order allowing motion to*
*suppress reversed.*

---

[3]That the police recognized the Sony remote control as possible evidence of the break was uncontested. Indeed, defense counsel rejected the Commonwealth's offer to explore the factual basis for the police officers' understanding that the remote control may have been taken in the break and its connection to calling the Souzas to the scene of the stop. The defense stipulated that the Sony remote control and other items were identified by the Souzas.