COMMONWEALTH *vs.* GREGORY M. MOSES
(and eleven companion cases).[1]

Suffolk. May 8, 1990. - July 18, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Search and seizure, Probable cause. *Search and Seizure*, Threshold police inquiry, Probable cause, Automobile, Container. *Probable Cause.*

At the hearing on a motion to suppress evidence in a criminal case, the judge correctly ruled that a police officer had a reasonable suspicion that a drug transaction was taking place in the vicinity of a certain automobile and that he properly conducted a threshold inquiry of the occupants of the vehicle. [139-140]

In the circumstances of a police officer's threshold inquiry of the occupants of a motor vehicle, the officer's demand that the driver turn off the ignition and surrender the keys to the vehicle was a reasonably prudent protective measure that did not change the investigative stop into an arrest. [141-143]

In the circumstances of police officers' lawful investigative stop of a motor vehicle and threshold inquiry of the automobile's occupants, the officers were entitled to conduct a protective search of the occupants and the area in the vehicle from which they might have obtained a weapon. [143-144]

Police officers conducting a lawful protective search of a vehicle, who discovered a packet of cocaine in plain view and a loaded handgun beneath the passenger-side dashboard, were then justified in searching, under the "automobile exception" to the warrant requirement of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, every portion of the vehicle and its contents for contraband. [144-146]

INDICTMENTS found and returned in the Superior Court Department on December 12, 1988.

---

[1] The other defendants are Robert P. Cohn and Joseph I. Laterra.

Pretrial motions to suppress evidence were heard by *James P. Donohue*, J.

Applications for interlocutory appeal were allowed by *Wilkins*, J., in the Supreme Judicial Court for the county of Suffolk and the appeals were reported by him.

*Joseph J. Balliro* for Robert P. Cohn & another.

*Roger A. Cox* for Gregory M. Moses.

*Daniel M. Marposon*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendants each were indicted for trafficking in cocaine (more than 200 grams), conspiracy to violate the controlled substances laws, unlawful possession of a Class "C" controlled substance with intent to distribute, and four counts of unlawfully carrying a firearm in a motor vehicle. After a hearing, a Superior Court judge denied the defendants' motions to suppress evidence (firearms and drugs) seized in a warrantless search of an automobile. A single justice of this court allowed the defendants' applications for interlocutory appeal. See Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979). The defendants challenge the initial stop and inquiry, a police officer's taking of the driver's keys, the search of the automobile, and the seizure of certain evidence from the automobile. We affirm the decision and order denying the motions.

We summarize the findings of fact from the judge's decision and order. Officer Robert F. Butler of the Boston police department was on routine patrol on Washington Street in Boston in a marked, one-man, radio response police cruiser. A fourteen-year veteran of the Boston police department, Butler was in uniform that evening. At approximately 5:45 P.M., he observed a white, 1988 Mercury sedan parked parallel to the curb on Washington Street, near the intersection of Mystic Street, with its engine running. No other cars were parked near the Mercury because it was in a marked bus stop.

From fifty feet away, Butler saw four black or Latino men standing near the passenger side of the Mercury. Two of the men appeared to be looking into the automobile through the

front passenger window. Butler did not recognize any of the men. When they made eye contact with Butler, the men standing outside the automobile quickly dispersed in the vicinity of a nearby housing development.

Continuing his patrol, from twenty-five to thirty feet away, Butler observed three white men sitting in the Mercury, two in the front seat and one in the rear passenger seat. Butler made eye contact with the front seat passenger, the defendant Gregory M. Moses, who immediately ducked below the dashboard, out of Butler's sight. After observing this movement, Butler pulled the cruiser to within five feet of the Mercury and parked at an angle perpendicular to the Mercury's left front wheel. The cruiser did not block the Mercury against the curb and it could have been moved either forward or backward by the driver.

Butler approached the driver's side of the automobile for the purpose of "mak[ing] an inquiry," and demanded that the driver, Joseph I. Laterra, shut off the engine and give him (Butler) the keys. Laterra complied. Butler then ordered all of the men to keep their hands in sight.

Coincidentally, two other police officers also on routine patrol, Daniel J. Coleman and Kevin Roddy, arrived at the scene. Coleman parked his cruiser behind the Mercury in such a way that the Mercury could not back up. Butler told Coleman to remove Moses from the front passenger seat. When Moses rose from the seat, Coleman observed a small plastic envelope containing a white powder, which Coleman believed to be cocaine, lying on the seat where Moses had been sitting. Coleman moved Moses away from the Mercury, patted down the exterior of his clothing, and handcuffed him.

The judge found that "Butler suspected that Moses' gesture below the dashboard was an attempt to conceal an object" and he feared that the object might be a weapon. Butler looked in the area where Moses was sitting and found a loaded .357 magnum handgun under the seat. He seized the weapon and informed Moses that he was under arrest. Laterra and Robert P. Cohn, the back seat passenger, were removed from the automobile, patted down, and placed

under arrest. The defendants were handcuffed and moved away from the automobile.

Assisted by Ben Leong and Ed Walsh, both members of the Boston police department's drug task force who stopped while passing by, the officers opened the Mercury's trunk by releasing an electronic latch in the glove compartment. In the trunk, the officers found several containers and a man's suit covered with what appeared to be paint chips. An open box contained an electronic scale of the type commonly associated with drug sales.

Three closed containers were visible in the trunk. A closed, but unlocked, briefcase contained nine large plastic bags containing a white rock-like substance, three plastic bags of pills, and a plastic container. When the officers opened the plastic container, they found another bag containing a rock-like substance and a .38 caliber handgun. A black, unlocked briefcase contained personal papers of Laterra. The officers pried a locked grey case open one to one and one-half inches and observed a gun inside. Subsequently, the lock was cut at the station.

The defendants argue that "Butler lacked the reasonable, articulable suspicion of criminal conduct required for a threshold inquiry of the occupants of the Mercury." They claim that Butler "had only seen activity which was completely consistent with lawful and innocent behavior and was, at most, operating on a hunch in investigating the Mercury."[2] They conclude that Butler's initiation of an investigatory inquiry was not reasonable. We do not agree.

---

[2]The defendants note that Butler did not actually see anything pass between the defendants or the men standing outside the car. They claim that the actions of the men standing near the automobile were consistent with any number of innocent activities; that "after sighting Officer Butler approaching, these individuals did not run, but walked away in different directions, in a fashion inconsistent with any involvement in criminal activity, and displaying no consciousness of guilt"; that when Moses leaned forward so that he was completely out of Butler's sight, "he may or may not have been attempting to conceal anything"; that none of the other defendants made any movement; and that the Mercury was parked on Washington Street at rush hour, "not at a time consistent with suspicious or criminal activity."

"In 'stop and frisk' cases our inquiry is two-fold: first, whether the initiation of the investigation by the police was permissible in the circumstances, and, second, whether the scope of the search was justified by the circumstances." *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). See *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). "A police officer may stop a vehicle in order to conduct a threshold inquiry if he has a reasonable suspicion that the occupants have committed, are committing, or are about to commit, a crime. His suspicion must be based on specific, articulable facts and reasonable inferences drawn therefrom. A hunch will not suffice." *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984), and cases cited. See *Terry, supra* at 21; *Commonwealth* v. *Helme*, 399 Mass. 298, 301 (1987); *Commonwealth* v. *Ferrara*, 376 Mass. 502, 505 (1978). The motion judge ruled that "[Butler] had reason to suspect that a drug transaction was taking place." We agree. Butler knew from his own experience that Washington Street was in a high crime area. He saw four black or Latino men standing near an automobile parked next to the sidewalk with its motor running. The men on the sidewalk appeared to be interacting in some way with three white men who sat in the automobile. On making eye contact with Butler,[3] all four of the black or Latino men quickly dispersed in two different directions. One of the occupants of the automobile, on making eye contact with Butler, immediately ducked under the dashboard, completely out of Butler's sight. The facts were sufficient for a threshold inquiry and as ample as those in other cases in which we have upheld threshold inquiries. See, e.g., *Commonwealth* v. *Wren*, 391 Mass. 705, 707-708 (1984); *Commonwealth* v. *Moynihan*, 376 Mass. 468, 470-471 (1978); *Commonwealth* v. *Almeida*, 373 Mass. 266, 268 (1977).

---

[3] Of course, "[a]n attempt to avoid contact with an observation by the police, while not enough in itself to justify a suspicion, may be considered along with other facts; an attempt to elude the police once pursuit begins may not be considered. See *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981); *Commonwealth* v. *Bacon*, 381 Mass. 642 (1980)." *Commonwealth* v. *Wren*, 391 Mass. 705, 708 n.2 (1984).

The defendants argue that "when Officer Butler seized the car keys from the defendants, he arrested them without probable cause."[4] The motion judge stated that "[t]his court does not ignore the fact that the action by the police of taking the car keys from Laterra may be interpreted as tantamount to arrest. See *Commonwealth* v. *Brillante*, 399 Mass. 152 (1987); *Commonwealth* v. *O'Connor*, 21 Mass. App. Ct. 404 (1986). By taking the car keys at the moment of the initial inquiry, the police exerted complete control over the defendants, and may have created an impression in their eyes, as in the eyes of any reasonable person in this situation, that they were not free to leave. [Citations omitted.] However, it is common knowledge that a person who wants to avoid police questioning, very often will recklessly drive away, resulting in serious injury to the police officer and bystanders. See *United States* v. *Harley*, 682 F.2d 398 (2d Cir. 1982). When Butler ordered Laterra to turn off the ignition and surrender the keys, he was acting as a reasonably prudent police officer, and his actions were similar to and consistent with the protective measures that have been sanctioned in *Terry* and *Silva*." We agree with the judge. The taking of the keys in the circumstances was a reasonably prudent protective measure and did not change the investigative stop into an arrest.

The pertinent inquiry is whether the degree of intrusion is reasonable in the circumstances. The degree of intrusiveness that is permitted is that which is "proportional to the degree of suspicion that prompted the intrusion." *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985). As he approached the

---

[4]Relying principally on *Commonwealth* v. *Bottari*, 395 Mass. 777 (1985), Cohn and Laterra argue that when Coleman and Roddy positioned the second police cruiser at the rear of the Mercury, the defendants were under arrest. We do not agree. We concluded that an arrest occurred in *Bottari* when the officers blocked a suspect's car; approached it with their guns drawn and ordered the suspects out of the car at gun point, although their use of force was not precipitated by any actions of the defendant; and the officers did not fear for their safety or the safety of others. *Bottari*, *supra* at 782. Here, the officers did not draw their guns, did not order the defendants out at gun point and at least one officer, Butler, feared for his safety.

car, Butler feared that Moses had access to a weapon. Butler kept his own gun holstered, although he rested his hand on the gun's handle.[5] See *Commonwealth* v. *Bottari*, *supra* at 781. At the moment when Butler asked for the keys, he was outnumbered by the defendants, three to one. He suspected that Moses's furtive movement was an attempt to conceal a weapon. Butler testified that he told Moses to turn the automobile's engine off and to give him the keys "[b]ecause [he] had a fear at that time that there may be possibly a weapon involved here." We conclude that Butler's action in asking for and taking the keys was proportionate to the circumstances and involved no more intrusion than would have occurred had he ordered the defendants out of the automobile or blocked it with his cruiser. The effect was the same: the defendants temporarily could not move the car.

We recognize that car stops present special public safety considerations. "[W]hen approaching a stopped car, a police officer is to some degree impaired in seeing whether a person therein may be drawing a gun." *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 306 (1986), citing *United States* v. *Harley*, 682 F.2d 398 (2d Cir. 1982). In a justified stop, officers may take reasonable precautions for their own safety, including "ordering occupants out of a car for questioning." *Commonwealth* v. *Robbins*, 407 Mass. 147, 151-152 (1990), quoting *Commonwealth* v. *Ferrara*, 376 Mass. 502, 505 (1978), citing *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977). Police officers are "not required to gamble with their personal safety." *Id.* at 152.

Moreover, in some circumstances, the blocking of a suspect's automobile with one or more cruisers so that the auto-

---

[5]The defendants claim that Butler "displayed a show of force in support of his authority by placing his hand on his gun." We do not agree. We have found a show of force where officers have drawn their guns. See, e.g., *Bottari, supra* at 781-782. Rather than constituting a show of police force, Butler's action in resting his hand on his holstered gun indicates that he was aware of the risk that he found himself in as he approached the car and that he feared that Moses may have been armed. See *Commonwealth* v. *Ballou*, 350 Mass. 751, 756-757 (1966), cert. denied, 385 U.S. 1031 (1967); *United States* v. *Jackson*, 652 F.2d 244, 249-250 (2d Cir. 1981).

mobile cannot move would not be, by itself, so intrusive as to change an otherwise lawful *Terry* stop into an arrest.[6] See *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984); *Commonwealth* v. *Riggins*, 366 Mass. 81, 86-87 (1974). "We think the police could act on a probability that the occupants of the car, conscious of guilt and fearing imminent exposure, would, unless blocked [or otherwise temporarily immobilized], attempt flight, with danger to the public, the police racing in pursuit, and the occupants themselves. Examples of these dangers appear in the cases. See *Commonwealth* v. *Fitzgibbons*, [23 Mass. App. Ct.] 301, 305-306 (1986); *United States* v. *Harley*, 682 F.2d 398, 401-402 (2d Cir. 1982); *[United States]* v. *Jones*, 759 F.2d 633, 638 (8th Cir.), cert. denied, [474 U.S. 837] (1985)." *Commonwealth* v. *Blake*, 23 Mass. App. Ct. 456, 460 (1987). See *Commonwealth* v. *Reed*, 23 Mass. App. Ct. 294, 298 (1986). See also *United States* v. *Vargas*, 633 F.2d 891, 896 (1st Cir. 1980); *United States* v. *Marin*, 669 F.2d 73, 81 (2d Cir. 1982).

The defendants argue that the warrantless search of the passenger compartment and the trunk of the Mercury and the containers found inside the trunk was unsupported by probable cause and therefore violated the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. The motion judge concluded that "[b]ased on Butler's observations of the apparent transaction between the parties, seeing the passenger make a possible gesture of concealment and knowing drug trafficking is fraught with violence, . . . Butler was also justified in conducting a protective search of the suspects and the area from which they might obtain a weapon. *Silva*, 366 at 408." The judge's findings and rulings are amply supported by the evidence. Thus, there is no merit to the defendants' argument.

---

[6] " '[B]locking generally will be reasonable when the suspect is in a vehicle because of the chance that the suspect may flee upon the approach of police with resulting danger to the public as well as to the officers involved.' " *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 304 (1986), quoting *United States* v. *Jones*, *supra*.

"[T]he officers could take reasonable precautions for their own protection. Such precautions may include ordering occupants out of a car for questioning. *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977). They also may include a search extending into the interior of an automobile, but they are 'confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.' "[7] *Robbins, supra* at 151-152, citing *Farrera, supra* at 505, quoting *Almeida, supra* at 272. Further, the protective search here was "confined in scope to an intrusion reasonably designed to discover" a weapon that could have been concealed by Moses beneath the dashboard. *Silva, supra* at 408. See *Robbins, supra; Brillante, supra* at 155; *Commonwealth* v. *Sumerlin*, 393 Mass. 127, 130 (1984). While removing Moses from the car in order to conduct the protective search, Coleman saw a packet of cocaine in plain view on the passenger seat where Moses had been sitting. Butler, in investigating the object that he had observed Moses concealing, found a loaded handgun.

The motion judge ruled that because "the officers had justification to conduct the threshold inquiry and the subsequent protective search of the car and its occupants, the contraband they discovered was lawfully seized. Although a protective search must be limited in scope, the discovery of illegally possessed firearms and drugs justified the further search of every portion of the vehicle, including the parts capable of concealing other contraband or weapons . . . . The police therefore were justified in searching the trunk and the containers and the drugs and weapons discovered there were lawfully seized." See *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 290-291 (1986), citing *United States* v. *Ross*,

---

[7] The defendants Cohn and Laterra argue that Butler should have requested identification from the defendants and "[o]nce that identification was verified, the officer's investigation should have been completed forbidding further restraint and search." *Commonwealth* v. *Loughlin*, 385 Mass. 60 (1982), on which the defendants rely, does not prohibit a police officer from conducting a valid protective search prior to conducting a justifiable threshold inquiry.

456 U.S. 798, 825 (1982). Once the officers discovered the cocaine and the handgun pursuant to the protective search, they had probable cause to search the entire automobile, including the passenger compartment and the trunk, for contraband and weapons. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 350 (1983).[8]

The warrantless search of the closed containers found in the trunk under the "automobile exception" to the warrant requirement of the Fourth Amendment and art. 14 of the Massachusetts Declaration of Rights was lawful. " '[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle *and its contents* that may conceal the object of the search.' (emphasis added.) *United States* v. *Ross, supra* at 825. See *Commonwealth* v. *Cast*, [407 Mass.] 891, 906-908 [1990]; *Commonwealth* v. *King*, 389 Mass. 233, 247 (1983); *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 291 (1986)." *Commonwealth* v. *Wunder*, 407 Mass. 909, 913 (1990). "[U]nder art. 14, as under the Fourth Amendment, a lawful warrantless search of a motor vehicle, based on probable cause to search the vehicle, [lawfully stopped] extends to all containers, open or closed, found within." *Commonwealth* v. *Cast, supra* at 908. See *Commonwealth* v. *Wunder, supra* at 915.[9]

---

[8]The defendants Cohn and Laterra argue that "the discovery of contraband and a weapon in the front seat passenger side of the vehicle could not have given rise to a reasonable inference that the search of the trunk of the vehicle . . . [c]ould be a lawful threshold inquiry." They conclude that the search exceeded the scope of a valid *Terry* stop. They also claim that the search of the trunk was not a lawful search incident to an arrest. See G. L. c. 276, § 1 (1988 ed.). Their arguments fail because the search of the trunk was not made pursuant to *Terry* or the statute, but was a valid search pursuant to the automobile exception to the warrant requirement after contraband had been found and therefore was based in probable cause. See *Chambers* v. *Maroney*, 399 U.S. 42 (1970); *Carroll* v. *United States*, 267 U.S. 132 (1925).

[9]"We note that a different question arises under art. 14 upon the warrantless opening of a closed, locked or unlocked, container found during an inventory search of a motor vehicle." *Cast, supra* at 908, n.5.

Butler testified that "[t]here was a gray plastic case . . . in the trunk of the vehicle. [He] took that out. It was locked . . . [with a] combination lock on it. [Butler] was able to open up the case maybe an inch, an inch and a half" so that he could look inside and he "was able to see at least one more gun . . . . As a result of that, [he] took custody of [the case] and placed [it] at [his] foot [along with the other containers] . . . . The vehicle was brought back to the police station where it was thoroughly searched . . . [and] subsequently towed away . . . . [B]ack at the station . . . Roddy obtained a bolt cutter . . . [and they] cut the combination lock and opened up the gray plastic case." Inside they found two handguns and ammunition. Butler partially opened the case and saw one gun. Although the case was not completely opened until it was at the police station, because the search began at the automobile, it was still governed by the automobile exception. A reasonable delay in a warrantless automobile search does not violate the Fourth Amendment or art. 14. See *United States v. Johns*, 469 U.S. 478, 485-487 (1985); *Chambers v. Maroney*, 399 U.S. 46-52 (1970). "The practical effect of the opposite conclusion would only be to direct police officers to search *immediately* all containers that they discover in the course of a vehicle search" (emphasis supplied). *Johns, supra* at 486.

We affirm the judge's decision and order denying the motion to suppress.[10] We remand the case to the Superior Court for trial.

*So ordered.*

---

[10]Citing *United States v. Ross*, 456 U.S. 798 (1982), the defendants Cohn and Laterra argue that the search of the trunk and containers found therein required "the existence of probable cause to believe that the vehicle contained drugs and/or weapons prior to the stop." We do not agree. We read *Ross* to require that probable cause exist prior to the search of a lawfully stopped vehicle, but it does not require that probable cause exist prior to the stop itself. See *Ross, supra* at 825; *Commonwealth v. King*, 389 Mass. 233, 243-247 (1983); *Commonwealth v. Jiminez*, 22 Mass. App. Ct. 286, 290-291 (1986).

In *Forster* v. *R.J. Reynolds Tobacco Co.*, *supra*, the Supreme Court of Minnesota declared that a claim of intentional misrepresentation brought against a cigarette manufacturer was not preempted by the Cigarette Labeling Act, despite the fact that the claim depended upon allegations which included the manufacturer's advertising activities. *Id.* at 662. The court based its decision on a finding that the cause of action "[did] not lie in challenging the adequacy of the federal warning [or] in claiming a dilution of that warning." *Id.* With reference to the plaintiff's claim of intentional misrepresentation, the Minnesota Supreme Court stated that, "[t]o find in this situation an implied preemption, we would have to assume that Congress intended the Act to be a license to lie, an assumption both uncharitable to Congress and violative of this state's deep concern for honesty as well as health." *Id.* at 662. In so far as the plaintiff's claim did not implicate a claim of a breach of a duty to warn, it was allowed to proceed. *Id.*

I, too, am unwilling to ascribe to Congress the intent to provide cigarette producers "a license to lie." Such a result is not compelled by the Cigarette Labeling Act's preemption of claims based on a duty to warn, and is incompatible with the long-standing rule that a court must guide its preemption analysis according to the "overriding presumption that 'Congress did not intend to displace state law.'" *Cipollone* v. *Liggett Group, Inc.*, 789 F.2d at 185, quoting *Maryland* v. *Louisiana*, *supra* at 746. The Minnesota case, with its scenario of "a license to lie," provides a clear example of but one of the extreme positions this State would have to accept were it to

tivity. *Id.* at 582. However, the Eleventh Circuit has yet to indicate its acceptance or rejection of the decision in *Cipollone II.*

· I note as an interesting sidelight that in *Cipollone II* the Third Circuit held that the plaintiff's risk-utility claim was not preempted. *Id.* at 582 n.52. The cigarette manufacturer in that case had argued that the risk-utility claim called into question cigarette advertising and promotional activity. *Id.* The court, however, disagreed, stating that the risk-utility claim "involves the basic decision to market the product." *Id.*

insulate all cigarette advertising activity from scrutiny under State law.

2. *State law claims.* The judge denied Philip Morris's motion for summary judgment as to each of the plaintiffs' four claims. It seems clear on this record that the focus of the judge's decision was the issue of the survival of the plaintiffs' claims under Federal preemption analysis, and not, as the court suggests, as a ruling on matters of State law. I come to this conclusion primarily because the judge's order anticipated "considerable discovery" should his denial of the motion for summary judgment be upheld on appeal. Had the judge's decision focused on the State law claims, it seems logical to me that he would have considered discovery to have been substantially completed on these issues. His discussion of "considerable" future discovery suggests that such was not the case. See *Kauffman* v. *Puerto Rico Tel. Co.*, 841 F.2d 1169, 1172 (1st Cir. 1988) (summary judgment generally should not enter unless there has been adequate time for discovery).

a. *Civil conspiracy.* The plaintiffs allege that Philip Morris entered into a conspiracy with Store 24 and "diverse unknown distributors of Parliaments and Marlboros" to sell cigarettes to minors in the Commonwealth. The plaintiffs claim that, pursuant to an express or implied agreement to combine with Store 24 and unknown distributors to increase sales of Parliament and Marlboro to minors, Philip Morris engaged in concerted action intended to further the designs of the conspiracy. Such action was described in the complaint as "including but not limited to marketing practices [designed to increase the attractiveness of Parliament and Marlboro to minors and] the continuing distribution of Parliament and Marlboro to defendant The Store 24, Inc. over time while possessing actual knowledge that said retail defendant was engaging in a pattern and practice of selling said Parliament and Marlboro to minors in violation of M. G. L. ch. 270 § 6."

In order to establish liability under a concert of action theory, the plaintiffs must establish that there was an express or

implied agreement between Philip Morris and Store 24 to sell cigarettes illegally to minors. *Gurney* v. *Tenney*, 197 Mass. 457, 466 (1908). *Payton* v. *Abbott Labs*, 512 F. Supp. 1031, 1035 (D. Mass. 1981). The plaintiffs argue that an agreement may be inferred from the conduct of Philip Morris and Store 24, in which Store 24 sold cigarettes to minors and Philip Morris, with knowledge of the illegal sales, continued to supply Store 24 with cigarettes and undertook a marketing campaign designed to encourage minors to buy cigarettes.

This court has recognized that an agreement may be inferred due to the concerted action of the parties. See *Commonwealth* v. *Taber*, 350 Mass. 186 (1966); *Orszulak* v. *Bujnevicie*, 355 Mass. 157 (1969); *Nelson* v. *Nason*, 343 Mass. 220 (1961); *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 494 (1921). In one of the cases cited by the plaintiffs, *Direct Sales Co.* v. *United States*, 319 U.S. 703 (1943), cited with approval by this court in *Commonwealth* v. *Taber*, *supra* at 187, the United States Supreme Court sustained a conspiracy conviction, holding that an agreement to sell drugs illegally could be inferred between a mail-order pharmaceutical business and a physician who falsified prescriptions in order illegally to sell morphine purchased from the mail-order business. In *Direct Sales*, *supra*, the Court relied upon the fact that (1) morphine is a restricted commodity, (2) the mail-order business encouraged high quantity sales, and (3) the mail-order business, despite being warned by the Bureau of Narcotics that it was being used as a source of supply by convicted physicians, continued to sell to the physician in question, on a daily basis, an amount of morphine equivalent to that prescribed by the average physician over the course of one year. *Id.* at 706-712.

For the purposes of the motion for summary judgment, the judge was entitled to conclude that Philip Morris's marketing and advertising activity, in conjunction with Store 24's illegal sale of cigarettes to minors, demonstrated a sufficient connection between Philip Morris and Store 24 to raise a genuine dispute as to the existence of an inferred agreement between

them. The plaintiffs' complaint claims that various "unknown distributors of Parliaments and Marlboros" are involved in a conspiracy with Philip Morris and Store 24. Regarding this point, the judge found that Philip Morris has conceded that a genuine factual dispute exists as to several facts, including whether "[a] pattern and practice of illegal retail sales of Marlboros to minors . . . exists in the Commonwealth." Additionally, as the judge's report stated, discovery had not yet been completed on this and other issues.

If the plaintiffs could show that the "pattern and practice" they alleged includes some concerted action between Philip Morris, the independent distributors, and Store 24, this could support an inference of an agreement between Philip Morris and Store 24. "It is not essential to a conspiracy that the parties meet or that they confer and formulate their plans. Common purpose may be inferred from concerted action converging to a definite end." *Attorney Gen.* v. *Tufts, supra* at 494. See *Commonwealth* v. *Taber, supra* at 186, 187. The existence of an agreement is a fact which is material to the resolution of a conspiracy claim. See *Gurney* v. *Tenney, supra* at 466.

In my view, the court should not rule that, based on the record before him, the judge erred in concluding that the plaintiffs should be allowed an opportunity to produce additional evidence to suggest a more concrete connection between the actions of Philip Morris and the alleged illegal activity of Store 24. Philip Morris was not entitled to summary judgment on the conspiracy count of the complaint.[3]

b. *Negligent entrustment.* In their complaint, the plaintiffs allege that Philip Morris, by knowingly encouraging sales of Parliament and Marlboro to minors and by failing to take affirmative action to prevent Store 24 from selling these cigarettes to minors, created an unreasonable risk of injury and negligently breached its common law duty not to entrust a

---

[3]The civil conspiracy claim does not implicate either the adequacy of the warning label required by the Cigarette Labeling Act or Philip Morris's duty to warn of the health hazards of its product. Accordingly, no part of the plaintiffs' civil conspiracy claim is preempted.

dangerous instrumentality to a minor. The plaintiffs' claim of negligent entrustment is based on "the general rule that a person may be found negligent for furnishing a dangerous instrumentality to a child who uses it to cause harm, since 'the serious consequences which [follow] ought to have been foreseen and guarded against.'" *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 10 n.4 (1983), quoting *Pudlo* v. *Dubiel*, 273 Mass. 172, 175 (1930).[4]

In order to establish liability for negligent entrustment of a dangerous instrumentality, the plaintiffs must prove, among other things, "that the defendant owned or controlled the [instrumentality] concerned." *Alioto* v. *Marnell*, 402 Mass. 36, 40 (1988), quoting *Leone* v. *Doran*, 363 Mass. 1, 7 (1973). If the plaintiffs were allowed to establish that Philip Morris entered into a conspiracy with Store 24 to sell cigarettes to minors, a jury reasonably could conclude that Philip Morris was able to exert some measure of control over the cigarettes. Whether this control rose to the level required to prove that Philip Morris "entrusted" cigarettes to minors would have been an issue for the jury. Because the judge found that further discovery may be necessary to flesh out the factual basis for the plaintiffs' allegations concerning Philip Morris's involvement in the alleged "pattern and practice" of illegal sales of cigarettes to minors, the court should not rule that the judge erred in denying the defendant summary judgment as to the plaintiffs' negligent entrustment claim.

Regarding the issue of actual knowledge of the plaintiffs' incompetence, it is evident from the provisions of G. L. c. 270, § 6, that the Legislature has determined that *all* minors, without the aid of a parent or guardian, are incompe-

---

[4]An action for negligent entrustment involves a person's duty to keep a dangerous instrumentality out of a child's reach, and would lie regardless of the adequacy of any warnings provided to the child regarding the dangers presented by the use of the instrumentality. Because Philip Morris's duty to warn of the hazards of its product is not implicated by the negligent entrustment claim, no portion of the claim is preempted by the Cigarette Labeling Act.

tent to make the decision whether or not to smoke cigarettes. Therefore, sellers or suppliers of cigarettes are prohibited from providing cigarettes to minors in the Commonwealth.[5] This legislative determination, incorporated into the plaintiffs' complaint by their reference to G. L. c. 270, § 6, provided a sufficient basis for the judge to conclude that the plaintiffs, who were minors at the time they purchased Philip Morris cigarettes, had raised a genuine dispute whether Philip Morris, "by inference or otherwise . . . had actual knowledge of the [plaintiffs'] incompetence." *Leone v. Doran, supra* at 13 n.3.

Because the plaintiffs have raised genuine issues of material fact concerning their allegation of negligent entrustment and as to their civil conspiracy claim, summary judgment was appropriately denied as to these counts of the complaint. Accordingly, I dissent from that part of the court's opinion which grants Philip Morris summary judgment.

---

[5]A violation of this statute will serve as evidence of the negligence of the seller or supplier in entrusting a dangerous instrumentality to a minor. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc., supra* at 10 (violation of a statute prohibiting provision of alcoholic beverages to minors can serve to establish negligence).