McCann, J.
INTRODUCTION
For the Commonwealth — Assistant District Attorney, Timothy M. Farrell.
For the defendant — John Bosk, Esquire.
The defendant, Ricardo Igaravidez (“Igaravidez”), is presently under indictment for a charge alleging trafficking in heroin pursuant to G.L.c. 94C, §32E(c). He filed a Motion to Dismiss and/or Suppress on the grounds of Violation of the Fourth Amendment of the United States Constitution, Article XIV of the Massachusetts Declaration of Rights, and G.L.c. 276, §1 et seq.
FACTUAL BACKGROUND
The Court makes the following Findings of Fact beyond a reasonable doubt and the following Rulings of Law.
William Pinkes (“Pinkes”) is a state trooper assigned to the Holden Barracks. He has been a trooper for eleven years and has been assigned to the Holden Barracks for three years. He has extensive training and experience in the detection of drugs and in investigations relating to drug activities. On May 30, 2002, Pinkes was working his normal 3-to-l 1 p.m. shift. He was driving eastbound on Interstate 290 (1-290) near the downtown Worcester area. Traffic was medium. There were three travel lanes. He was in the center lane. He observed two vehicles in front of him. The lead vehicle was a blue Jeep, the motor vehicle in question. *464 The second vehicle was between the Jeep and Pinkes. He observed that the Jeep was émitting a “noticeable"[1] amount of smoke. He never opined what he observed was “excessive.”[2] He also observed the Jeep jerk across the line separating the center travel lane from the left travel lane. The Jeep jerked across the line and came back. Pinkes testified that no turn signal was used and further that no change of lane was ever completed.
After Pinkes observed the Jeep jerk across the marked lane, and then return to the same lane, he activated his signal lights in order to stop the Jeep. The Jeep pulled into the break-down lane of the road, without incident, in the area of exit 11. Pinkes had no difficulty stopping the Jeep. At the time of the stop, he had followed the Jeep for a distance in excess of one mile.[3]
Pinkes parked behind the Jeep. For safety reasons, he approached the vehicle from the passenger side. There were two occupants in the car, the driver and a front seat passenger. As he approached the vehicle, Pinkes observed that the Jeep had a Pennsylvania license plate, No. EDV6885. He observed a duffle bag, a car transmission, a Pennsylvania license plate, and three cellular telephones on the back seat. Pinkes recognized two of the phones to be Nextel telephones and one to be a regular cellular telephone. He opined that he is familiar with the fact that Nextel telephones have a dual use. They can be used as a regular cellular telephone through a cellular network or as a direct-connect that allows one party to communicate with other Nextel users who have programmed their phones to receive such communication. The direct-connect feature is similar to a walkie-talkie and is unable to be picked up or traced by police. He opined that Nextels are commonly used by transporters and couriers of narcotics to remain in communication with followed vehicles, their destinations, or their sources. They provide a degree of anonymity to the users as they come prepaid and allow calls to be made on the move.
Pinkes asked the operator, Igaravidez, for his license and registration. Igaravidez produced a license but initially held onto it. He said that he could not find his registration. Pinkes asked him to retrieve his registration. Igaravidez resumed his search for his registration. Pinkes allowed him thirty seconds to do so. Igaravidez was unable to produce his registration within that time. Igaravidez handed Pinkes his license and told him he was not the owner of the Jeep. Pinkes ordered him out of the Jeep and to the rear of the Jeep. Igaravidez was wearing shorts and a shirt.
Igaravidez went to the rear of the Jeep. He was standing in 1-290 and cars were going by. Pinkes observed a change in Igaravidez’s demeanor. Ig-aravidez began wringing his hands and kept putting his left hand into his left short pockets. At the back of the Jeep, Igaravidez appeared to Pinkes to be swaying and shifting from foot to foot. Pinkes told Igaravidez to “take it easy” and explained that he had only stopped him for marked lane and excessive exhaust violations.
Pinkes asked Igaravidez what was causing the noticeable exhaust. Igaravidez stated that the car was overheating. Pinkes asked if the Jeep had a steering problem. Igaravidez replied, “No.” Pinkes asked where he was going. Igaravidez responded that he was going to Fitchburg to put a transmission in his car. While the conversation was going on, Igaravidez kept putting his hands in his pocket Igaravidez’s movements made Pinkes nervous and put Pinkes in fear that Igaravidez had a weapon. Pinkes directed him to put his hands on his head as he was going to pat frisk him. Igaravidez turned and instead of putting his hands on his head, he put his hands on his rear pants pocket. Pinkes told him to turn around. Igaravidez did not put his hands on his head and Pinkes took them and put them on his head. Pinkes held his hands there.
Pinkes patted Igaravidez down. As Pinkes was doing so, Igaravidez kept looking to his left and then to his right. He tightened his hands up and clenched his hands together. Pinkes got a “feeling” that Igaravidez was going to try to escape.
While executing the pat frisk, Pinkes felt a long flat object approximately 4" long and 3" wide with some depth within the area of Igaravidez’s shorts extending from below his waistband to down in between his legs. Pinkes opined that such containers are common methods for the concealment and transportation of narcotics. Pinkes also opined that such containers are consistent with something which could contain razors or weapons. Pinkes asked Igaravidez what the object was. Igaravidez replied, “I don’t know.” Pinkes pulled the waistband and saw a package wrapped in masking tape, which Pinkes opined was consistent with the packaging of narcotics. Pinkes handcuffed Igaravidez. Pinkes retrieved what turned out to be two packages from the back of Igaravidez’s shorts. He opened one of the packages and found that it contained several hundred bags of heroin marked “M-16.” He administered Miranda rights to Igaravidez. He asked Ig-aravidez to identify the package. Igaravidez replied that he was paid $1,000 to transport the package to someone near McDonald’s on Water Street in Fitch-burg. He was told that it was worth $500,000.
Pinkes never determined if the Jeep had a Pennsylvania sticker. He did, however, ultimately determine that the motor vehicle was properly registered. Ig-aravidez never threatened Pinkes during the whole process.[4]
DISCUSSION
There are three issues presented in this case: (1) whether Pinkes was warranted in initially stopping the motor vehicle when all he observed were two cars in front of him with the lead motor vehicle omitting a “noticeable” amount of exhaust and the lead vehicle making a jog over the left line, but immediately returning to his lane; (2) whether Pinkes was authorized to *465 order Igaravidez out of his motor vehicle when Ig-aravidez produced a valid license, but was unable to produce a registration within thirty seconds; (3) whether Pinkes was authorized to execute a pat frisk of Igaravidez after he produced a valid license, but was unable to produce a registration.
I. Initial Stop of the Jeep
A police officer must have a reasonable and articulable suspicion to stop an individual. Terry v. Ohio, 392 U.S. 1, 21 (1968). In determining the existence of reasonable suspicion, the court must consider whether the facts known to the officer at the time of the stop would warrant an officer of reasonable caution to suspect criminal activity. Id. at 21-22. Good faith on the part of the officer is not enough. Id. at 22. His conclusion must be drawn from reasonable inferences based on the facts in light of his training and experience. Id. at 27.
The principles set forth in Terry apply to stops of both pedestrians and motor vehicles. Commonwealth v. Bacon, 381 Mass. 642, 643 (1980). Massachusetts follows an “authoritarian” approach to motor vehicle stops, meaning that a stop is valid as long as it is one police are “legally permitted and objectively authorized” to make. Commonwealth v. Santana, 420 Mass. 205, 209 (1995), quoting United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir. 1989). Accordingly, while the law prohibits police from randomly stopping a vehicle to check a driver’s license and registration, it allows a stop any time police observe a traffic violation. Santana, 420 Mass. 205 at 207, citing Bacon, 381 Mass. 642 at 643. The fact that an officer may believe that an individual is engaged in criminal activity does not limit his power to make an authorized, motor vehicle stop. Santana, 420 Mass. 205 at 208 (holding suspicion of drug activity did not invalidate stop for broken taillight).
In this case, the evidence on which the Commonwealth seeks to validate the stop is that the Jeep was emitting a noticeable amount of smoke and that the Jeep jerked across the line separating the center travel lane from the left travel lane, but then came back without changing lanes.
G.L.c. 90, §114D provides in pertinent part as follows:
... Eveiy person... before ... making any turning movement which would affect the operation of any other vehicle, shall give a plainly visible sign by activating . . . directional signals ... in the event electrical or mechanical signals are not operating ... a plainly visible signal by means of the hand and arm shall be made . . .
Igaravidez jerked partially out of his lane and then back, but made no lane changes. Traffic was medium. There is no evidence that there was any traffic in the left travel lane and no evidence that any vehicles in the left travel lane were affected by the jerking movement of Igaravidez’s Jeep. There is no evidence that the motor vehicle between the trooper and the motor vehicle operated by Igaravidez was affected by the defendant’s operation. Furthermore, the evidence is totally devoid as to whether Igaravidez did or did not use a hand signal. There was a motor vehicle between Pinkes and the Jeep. The Jeep did not change lanes. The Court does not find credible testimony that Pinkes could see the Jeep clearly through an intervening vehicle in between his cruiser and the Jeep to determine whether either a mechanical or hand signal was or was not used.
The second basis for the justification for the stop is that Pinkes testified that the Jeep was emitting a noticeable[5] amount of smoke. G.L.c. 90, §6D provides in pertinent part as follows:
No person operating a motor vehicle shall. . . permit to escape from such vehicle smoke or pollutants in such amount or at such levels as may violate motor vehicle air pollution control regulations adopted under the provision of chapter 111...
It is routine police procedure to stop motor vehicles for defective equipment, such as broken taillights, excessively tinted windows, or other violations of state statutes. Santana, 420 Mass. 205 at 209 (involving broken taillight); Commonwealth v. Baez, 47 Mass.App.Ct. 115, 118 (1999) (pertaining to window tinting). In assessing statutory violations, the question is whether the officer reasonably believed, based on his observations, that the target’s vehicle or conduct violated state law. Baez, 47 Mass.App.Ct 115 at 118.
In Santana, the court held that an officer who had no more than a hunch that the occupants of a vehicle were engaged in illegal drug activity was nevertheless justified in stopping the vehicle because of a broken taillight. Santana, 420 Mass. 205 at 209. The court noted that troopers are assigned to patrol the highways for both traffic violations and drug activity and cautioned, “by driving an automobile with a broken taillight, the defendants took the risk of being stopped.” Id. at 210.
When a statutory violation is not based on obviously defective equipment, an officer may stop a vehicle if his observations give rise to a reasonable belief that the vehicle or the driver is violating a statute. Baez, 47 Mass.App.Ct. 115 at 118. In Baez, the court held that a state trooper acted reasonably when he stopped a vehicle for excessive window tinting because: the trooper was familiar with the state law regarding tinted windows; he was in possession of a device used to measure the amount of window tinting; and the trooper’s attention was drawn to the vehicle because of the window’s extremely dark tint. Id. (emphasis added). In Bacon, however, a driver’s youthful appearance was not a sufficient basis for stopping an automobile because the Commonwealth adduced no specific evidence that the operator appeared to be too *466 young to lawfully operate an automobile. Bacon, 381 Mass. 642 at 645 n.5 (emphasis added).
As in Bacon, where the officer noted that the defendant had a youthful appearance but failed to provide specific information about why his appearance gave rise to the inference that the defendant was too young to operate a motor vehicle, Pinkes, in this case, said that the Jeep which he observed was emitting a noticeable amount of smoke, but he failed to provide any information from which a reasonable person could draw an inference that the smoke exceeded any statutory limits for motor vehicle exhaust. Id. Pinkes did not opine that the exhaust was excessive but only noticeable. Pinkes made no reference to the fact that the smoke he saw violated the provisions of c. Ill or that it in fact was so excessive so as to violate any provision of law. In fact, Igaravidez stated to Pinkes that the engine was overheating, a reasonable explanation for the smoke.
Unlike the situation in Baez, in which the officer had, in his training and experience, a reasonable basis for believing the defendant’s windows were excessively tinted, possessed the tools for measuring the tint levels, and, in fact, confirmed that the windows were excessively tinted through measurements taken at the scene of the stop, Pinkes offered no evidence that the amount of exhaust appeared to him to exceed any legal limit, that he possessed a mechanism for measuring exhaust levels, or that he later confirmed that the exhaust exceeded a legal limit. Baez, 47 Mass.App.Ct. 115 at 118. Accordingly, the Commonwealth failed to show that Pinkes had a reasonable basis for stopping Igaravidez’s vehicle based on an excessive exhaust violation.
In conclusion, this Court finds that the act of a motor vehicle jerking once over across a line and coming back into his lane and continuing for a short period of time suggests nothing but an inadvertent move. Pinkes had followed the vehicle for some time, in excess of a mile, and observed no erratic driving to suggest operating under the influence or other traffic violations. Furthermore, Pinkes did not establish that there was an excessive amount of emissions. As a result, this Court rules that Pinkes had no reasonable basis to pull over the Jeep.
II. Order to Exit the Jeep
Assuming, arguendo, that the initial stop was valid, although this Court has not so found, the second issue is whether Pinkes had reason to ask Igaravidez to exit the Jeep. Article XIV requires that a police officer, in a routine traffic stop, have an objectively reasonable belief that his safety or the safety of others is in danger before ordering a driver out of his vehicle. Commonwealth v. Gonsalves, 429 Mass. 658, 662-63 (1999) (diverging from federal analysis). Because an officer faces enormous danger when approaching an unknown vehicle on a public roadway, the standard for an exit order is not high. “While a mere hunch is not enoughl,] it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order.” Id. (citations omitted); citing Commonwealth v. Johnson, 413 Mass. 402, 406 (1992). Courts have upheld exit orders on safety grounds in cases in which officers observed occupants engaging in such conduct as reaching into the car or interior compartments, making erratic gestures, and bending out of view. Commonwealth v. Vanderlinde, 27 Mass.App.Ct. 1103, 1104 (1989) (reaching into well between seats); Commonwealth v. Torres, 433 Mass. 669, 674 (2001) (“messing” with object on floor of vehicle); Commonwealth v. Moses, 408 Mass. 136, 138 (1990) (ducking under dashboard).
Absent facts that give rise to a reasonable safety concern, a police inquiry in a routine traffic stop must end at citation or at the production of a valid license and registration, unless the officer has a reasonable basis for inferring that a crime has been committed, is being committed, or is about to be committed. Torres, 433 Mass. 669 at 674; Commonwealth v. Robie, 51 Mass.App.Ct. 494, 498 (2001). In Robie, the court held that a routine traffic stop of an individual who could not produce a registration transformed into reasonable suspicion that justified an exit order because: the driver retrieved his license from an unusual place in the vehicle; the driver appeared nervous and answered questions about his destination evasively and in a manner that was inconsistent with information known to the trooper; upon calling in the driver’s license, the trooper received radio information that the driver was a suspect in a string of burglaries; the driver had clothing on the backseat that was consistent with the type used in the commission of burglaries; and the stop took place on a dark side street. Robie, 51 Mass.App.Ct. 494 at 498 (finding circumstances gave rise to both suspicion of burglary, safety concerns). Similarly, in Commonwealth v. Santiago, an exit order to the driver of a vehicle stopped for going the wrong way down a one-way street was upheld where the officers recognized a vehicle as one involved in a string of sexual assaults. 53 Mass.App.Ct. 567, 569 (2002).
An individual may also be ordered out of a vehicle if, during the course of the stop, the officer finds evidence of an arrestable offense. In Commonwealth v. Robbins, 407 Mass. 147, 149 (1990), the court upheld an exit order because, although the passenger possessed a valid license and registration for the automobile, the driver had an outstanding warrant for the arrestable offense of operation after suspension of a license.
Igaravidez produced a valid license. The fact that he could not produce a registration in and of itself seems to be the only reason why he was ordered out of the vehicle. Later information proved that the Jeep was properly registered. Failure to produce a registration *467 is not one of the arrestable motor vehicle offenses set forth in G.L.c. 90, §21. Therefore, absent a concern for his safety or a reasonable indication of criminal activity, Pinkes’s inquiry should have ended with a citation to Igaravidez for failure to produce a valid registration. Torres, 433 Mass. 669 at 674.
When Pinkes approached Igaravidez’s vehicle, he observed a transmission, a Pennsylvania license plate, a black duffle bag, two Nextel phones, one cellular phone, and two occupants. Neither Igaravidez nor the passenger made any furtive movements or gestures. Unlike in Robie, in which an exit order was justified because the driver appeared nervous, answered questions evasively, was known to the officer to be a suspect in a string of burglaries, and possessed equipment commonly used in the commission of burglaries, Igaravidez appeared calm, answered questions in a manner consistent with the officer’s knowledge and observations, and was not known by Pinkes as an individual involved in narcotics trafficking. Robie, 51 Mass.App.Ct. 494 at 498. When questioned, Ig-aravidez informed Pinkes that he was driving to Fitch-burg to replace his car’s transmission, information consistent with his direction of travel, the transmission on his back seat, and the smoke that had been emanating from his overheating vehicle. The appearance of a duffle bag, a license plate, and some cellular phones, without further connection to drug transportation, is not enough to color the facts with the requisite indicia of criminal activity or to create an objectively reasonable concern for officer safety. Therefore, this Court finds no reasonable basis for the exit order.
III. The Pat Frisk
The third issue is, assuming the initial stop and the exit order were valid, although this Court has concluded they were not, whether the pat frisk was proper. The standard for a pat frisk is the same as that required to justify an exit order. Commonwealth v. Torres, 433 Mass. 669, 676 (2001). To justify a search for weapons, the Commonwealth must establish by an objective test that there is a reasonable basis for believing the suspect posed a danger to the officer or to others. Id. The scope of the search is confined to what is minimally necessary to ascertain whether the suspect is armed and, if so, to retrieve his weapon. Commonwealth v. Silva, 366 Mass. 402, 408 (1974) (limiting frisks to pat down of outer garments). Only upon the discovery during the initial pat down of something that feels like a weapon may an officer conduct further investigation. Compare Silva, 366 Mass. 402 at 408 (precluding further inquiry when no weapon found during frisk); with Johnson, 413 Mass. 598 at 556-57 (justifying seizure of package concealed in defendant’s pants).
Once Igaravidez exited the vehicle, the marked change in his demeanor and his furtive movements gave rise to a reasonable threat to Pinkes’s safety. Igaravidez appeared nervous by reason of his continuing to put his hands in his pockets, swaying, and shifting from foot to foot. He kept reaching into his left pants pockets. Pinkes was concerned that Igaravidez might have had a weapon. As in Torres, Vanderlinde, and Moses, cases in which defendants’ ducking, shifting, and other quick movements posed risks to officer safety, Igaravidez’s continued efforts to reach into his left pants pocket, refusal to place his hands on his head, and scanning the roadway as if looking for an escape route posed a sufficient enough risk to the safely of both Pinkes and motorists traveling on 1-290 to justify a pat frisk. See infra at 9.
Once Pinkes felt the bulge in Igaravidez’s pants, he was authorized to conduct further inquiry because, based on Pinkes’s training and experience, the package he felt was consistent with the fype of container used to conceal razor blades or other weapons. As the Supreme Judicial Court noted in Johnson:
It is not necessary that the [court] specifically find the officer believed the bulge inside the defendant’s pants was a weapon. It is necessary for the protection of the officer and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized.
Johnson, 413 Mass. 598 at 601.
Neutralizing a potential threat of harm is precisely what Pinkes did in this case. Therefore, assuming the initial stop and the exit order were proper, this Court determines that the pat frisk was permissible and that the scope of the search was justified in the circumstances.
The Defendant’s Motion to Dismiss and/or Suppress is construed solely as a Motion to Suppress.
In conclusion, this Court rules that there was no basis for the May 30, 2002 stop of Igaravidez’s vehicle or for the exit order that Pinkes issued to Igaravidez during that stop. Accordingly, pursuant to the Fourth Amendment to the U.S. Constitution, Article XIV of the Massachusetts Declaration of Rights, and G.L.c. 276, §1 et seq., Igaravidez’s Motion to Suppress is hereby ALLOWED.
ORDER
For the reasons stated herein, the Motion to Suppress is ALLOWED.

Noticeable — "evident, observable, perceptable, worthy of notice, significant" The American. Heritage College Dictionary, 3rd Edition, page 477 (1993).

Excessive is defined as “exceeding a normal, usual, reasonable, or proper limit.” Id.

The Court is familiar with the roadway and takes judicial notice of the distance.

Igaravidez sought to cross examine Pinkes on seven other unrelated stops to establish a pattern of pretextual stops and stops based on racial profiling. The Court barred the testimony for lack of proper foundation and relevancy.

See fn. 1.