Kern, Leila R., J.
The defendants, Christopher Konikowski, Ryan Johnston and Candis Charter, have each been indicted for trafficking in cocaine. Currently before this court are their Motions to Suppress Evidence. For the reasons given herein, the defendants’ Motions to Suppress are DENIED.
FINDINGS OF FACT
Based upon the weight of the credible evidence presented and the reasonable inferences drawn therefrom, this court finds the following facts. On April 10, 2008, Sergeant Christian Max, head of the Methuen Police Department drug unit, sent Drug Enforcement Administration agent William Castro (who often assisted such units) to Westgate Plaza on Haverhill Street in Methuen to conduct surveillance.[1] Drug activity was common in this area, which is in close proximity to a number of interstate highways. Castro had personally participated in about ten drug-related arrests in this area and Sgt. Max had participated in over twenty between January 2007 and April 10, 2008. According to Sgt. Max, most of the drug transactions here were “beep and meets,” in which drugs are distributed from one motor vehicle to another.
Castro arrived in the parking lot between four and five in the evening and parked his unmarked Jeep Cherokee in the area between Dunkin Donuts and Papa Gino’s. The Jeep had higher tires and modified shocks, and thus sat higher than non-sport utility vehicles. It had no tint on its front windshield. Castro chose his location in the lot to afford him a view of a payphone outside the McDonald’s in the shopping plaza. When he arrived, Castro noticed a tan, four-door Nissan Maxima parked some distance from his vehicle with its rear window facing the front of his car.[2] The rear window of the Maxima was not tinted. He saw two individuals inside the Maxima, a male in the front passenger seat and a female driver, later identified as Konokowski and Charter, respectively. Castro noted that Charter and Konokowski frequently looked towards the entrance to the parking lot from Haverhill Street and that Konokowski made calls on a cell phone a number of times.
After Castro watched the Maxima for about twenty minutes, a blue Audi entered the parking lot from Haverhill Street and pulled into the space directly across from the Maxima facing it. The driver of the Audi, a white male later identified as Johnston, exited the vehicle with a white Market Basket shopping bag. Castro noted that the bag had a “heaviness” as he *453 observed Johnston twisting the bag around as he walked. Johnston got into the right rear passenger seat of the Maxima. Castro saw Johnston pass the bag from the rear to Konikowski. Konikowski immediately opened the bag and all three occupants looked inside.
Shortly thereafter, Charter backed the Maxima out of its parking spot, and drove around a small section of the parking lot before returning to the vicinity of her original spot and pulling in diagonally across the front of the Audi. Castro saw Charter point to the rear seat and Johnston pulled the rear armrest and placed the bag into the pass-through to the trunk. Johnston exited the back seat, returned to the Audi and left the parking lot via the Haverhill Street exit. The Maxima followed the Audi out that exit. The Audi turned right and the Maxima turned left. Castro followed the Maxima.
At some point while observing these events, Castro began communicating with and relaying the events he witnessed to Sgt. Max via cell phone. Castro told Sgt. Max that he believed he was witnessing a drug transaction. When the Maxima and the Audi left the parking lot, Castro informed Sgt. Max that he needed assistance with a marked unit. Max contacted dispatch to request marked vehicles. As Castro followed the Maxima towards the rotary on Haverhill Street, a marked cruiser driven by Sergeant Havey stopped the Maxima before it reached the rotary and pulled it over. Castro pulled over behind Havey’s cruiser. As Castro looked in his rearview mirror before exiting his Jeep, he saw the blue Audi about two vehicles behind his in heavy traffic. At that point, a second police cruiser driven by Sergeant Todd B. Himmer of the Methuen Police Department pulled up behind Castro’s Jeep. Castro informed Sgt. Havey that the blue Audi was involved and Sgt. Havey signaled the Audi to pull over. Johnston complied and parked behind the second police cruiser. Sgt. Himmer remained with the Audi while the other officers spoke to one another.
At some point, a third marked cruiser driven by Methuen police officer Scott Lever arrived. Lever parked his cruiser in front of the Maxima and walked to the driver’s side. Lever spoke with both Charter and Konokowski while they were seated in the car and asked them if they knew Johnston. They both said no.
At some point, Castro also spoke with Konokowski and asked him where he was coming from. Konokowski responded Pizza Hut and when Castro asked again he said “My mother’s house.” When Castro asked where his mother lived, he looked down and did not answer and appeared to be nervous. Castro also asked Konokowski whether he knew the man in the blue Audi. Konokowski said no. Castro relayed this response to Sgt. Havey. While speaking with Konokowski, Castro observed that the female driver’s hands were visibly shaking. Sgt. Himmer and Sgt. Havey asked Johnston if he knew the occupants of the Maxima, to which Johnston responded that Konokowski was a friend of his. Sgt. Himmer relayed this information to Castro.
After the defendants were questioned and gave conflicting answers about, e.g., whether they knew each other and where they were coming from, they were ordered out of their cars. Sgt. Havey asked Castro if he knew where the drugs were located in the Maxima and Castro said that he did. Sgt. Havey asked him to get them out of the Maxima, and Castro complied by reaching for them in the trunk through the back seat arm rest where he earlier had seen Johnston place the Market Basket bag. Castro opened the bag and saw that it contained two Ziploc bags that contained a white powdery substance (Exhibit 1). At this point, the three defendants were placed under arrest. Castro also removed two cell phones from the front passenger side of the Maxima. Sgt. Max arrived on the scene shortly hereafter and Castro gave him the drugs and two cell phones. Sgt. Max returned to the Methuen Police Department with the defendants who were booked.
RULINGS OF LAW
I. The Stop
The defendants contest the Commonwealth’s assertion that the police had grounds to stop their vehicles after they left the Westgate Plaza parking lot. The defendants argue that what Castro observed amounted to no more than innocent, non-criminal behavior. “A police officer may stop a vehicle in order to conduct a threshold inquiry if he has a reasonable suspicion that the occupants have committed, are committing, or are about to commit, a crime. His suspicion must be based on specific, articulable facts and reasonable inferences drawn therefrom. A hunch will not suffice.” Commonwealth v. Wren, 391 Mass. 705, 707 (1984). An objective test is used to weigh these factors. Commonwealth v. Bacon, 381 Mass. 642, 643 (1980).
The events that Agent Castro observed in the parking lot, particularly in light of his training and experience in that specific area, amply support reasonable suspicion that he had witnessed a drug transaction. Castro observed Johnston’s vehicle meet the Maxima, after the latter had been in the parking lot for at least twenty minutes with its occupants glancing towards the entrance through which Johnston’s vehicle arrived. Johnston exited his car, an Audi, with a bag, got into the Maxima and showed the contents of the bag to Charter and Konokowski. The parties then circled a portion of the parking lot, arrived back at the original location, Johnston placed the bag in the trunk through the back seat armrest pass-through, got back into the Audi and exited the parking lot. These actions, when viewed through Castro’s training and experience and given the high drug activity associated with the area, constitute articulable facts supporting a reasonable suspicion that a drug transaction had occurred. While the defendants’ behaviors may also have been *454 consistent with innocent activity, the totality of the circumstances amounted to more than a hunch that the activity was not innocent. See Commonwealth v. Sweezey, 50 Mass.App.Ct. 48, 52, rev. denied, 432 Mass. 1111 (2000) (officer’s observations of meeting in a parking lot in area known for high drug activity and viewed in light of “common sense and the officers’ experience” supported conclusion that was “substantially more than a hunch”). The police officers, therefore, had ample reasonable suspicion to conduct an investigatory stop of both the Maxima and the Audi.
II. Arrest
Pursuant to an investigatory stop, police may make a “threshold inquiry.” Wren, 391 Mass. at 707. Non-accusatory questioning that is investigatory and is generally of a fact-finding nature, or “intended to verify or dispel a reasonable suspicion of criminal activity” does not require Miranda warnings. Commonwealth v. Kirwan, 448 Mass. 304, 311 (2007), citing Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984). In this case, in addition to identifying information, the police officers asked the defendants whether they knew one another. This questioning was non-accusatory and was designed to explore the officers’ reasonable suspicion of criminal activity.[3]
The contradictory and apparently false responses to the officers’ questions, coupled with Charter’s and Konokowski’s observed nervousness, tipped the balance from reasonable suspicion justifying an investigatory stop to probable cause to arrest. “Probable cause to arrest exists where the facts and circumstances in the arresting officer’s knowledge . . . are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed.” Commonwealth v. Williams, 422 Mass. 111, 119 n.1 1 (1996). See also Commonwealth v. Va Meng Joe, 425 Mass. 99, 106 (1997) (“Since there is no doubt that the initial stop was justified, events subsequent to the lawful stop, coupled with the factors that supplied the police officers with ample reasonable suspicion to make the investigatory stop, provided the police officers with probable cause to arrest and search the defendant”).[4]
III. Search
Incident to a lawful arrest, police may search for evidence of the crime for which the arrest was made. Commonwealth v. Madera, 402 Mass. 156 (1988). The scope of the search is “strictly tied to and justified by the circumstances which rendered its initiation permissible.” Chimel v. California, 395 U.S. 752, 763 (1969). Generally, the search area is limited to an arrestee’s physical person and the area within his or her immediate control. Commonwealth v. Pierre, 72 Mass.App.Ct. 580, 582-83 (2008), f/a/r granted, 452 Mass. 1106 (2008). In the present case, the facts indicate that Castro retrieved two cell phones from the front seat passenger seat of the Maxima, an area in which Konikowski had been seated and was within his immediate control prior to the arrest. The seizure of these items was thus within the proper scope of a search incident to a lawful arrest.
The cocaine taken from the trunk was likewise properly seized pursuant to the automobile exception to the warrant requirement. When the police stop an automobile in a public place and have probable cause, “no more exigent circumstances are required by art. 14 beyond the inherent mobility of an automobile itself to justify a warrantless search of the vehicle.” Commonwealth v. Motto, 424 Mass. 117, 124 (1997) (war-rantless search of car permissible where police had probable cause to believe it contained heroin). The permissible scope of this search includes the whole vehicle, and all containers open or closed found within, limited to the areas in which objects of the search might reasonably be found. See Commonwealth v. Garden, 451 Mass. 43, 49-54 (2008) (“There is no question that in many cases involving searches of automobiles, probable cause to search extends to eveiy area within the vehicle, including the trunk”). In the present case, the Maxima was searched shortly after the stop and after probable cause arose. The search of the vehicle was limited to Castro reaching into the trunk through the rear seat armrest pass-through and finding the Market Basket bag in the location in which he had seen Johnston place it. The two cell phones were in plain view on the front passenger seat. The search was therefore proper under the automobile exception and did not exceed the permissible scope of an automobile search incident to a lawful arrest.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants to Motions to Suppress Evidence be DENIED.

The Westgate Plaza is also known as the Merrimack Plaza. Shops in this shopping plaza include a Market Basket grocery-store.

While the precise distance between the cars is disputed, the photograph marked as Exhibit 2 was not disputed and indicates that Castro was parked close enough to make the observations that follow.

Johnston is the only defendant who contests the failure to receive Miranda warnings. Given the nature of the questioning, Miranda warnings were not required.

The defendants argue that the police officers essentially placed them under arrest and in custody from the moment of the initial stop, because the Maxima was “boxed in” by the police cruisers. Whether an individual is in police custody is measured by whether “the degree of intrusiveness on a citizen’s personal security, including considerations of time, space, and force, [is] proportional to the degree of suspicion that prompted the intrusion.” Commonwealth v. Borges, 395 Mass. 788, 794 (1985). Whether the intrusion is reasonable under the circumstances is the relevant question. Commonwealth v. Moses, 408 Mass. 136, 141 (1990). Here, the facts indicate that the officer in the cruiser in front of the Maxima was there to secure the scene. The cars were pulled over near the entrance of a rotary during rush hour on a weekday and in heavy traffic. The two other marked cruisers were there to provide general backup as two cars were implicated in the *455 suspected drug transaction. The police officers’ actions, therefore, were proportionate with the suspicion of drug activity that led to the stop and were reasonable under the circumstances.